# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 03-1362

ESTHER OLOWO,

*Petitioner,*

*v.*

JOHN D. ASHCROFT, United States Attorney General,

*Respondent.*

_____

Petition for Review of an Order of
the Board of Immigration Appeals.
No. A45-084-852

_____

ARGUED MARCH 2, 2004—DECIDED MAY 11, 2004

_____

Before CUDAHY, RIPPLE and DIANE P. WOOD, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Esther Olowo is a native and citizen of Nigeria who has lawful permanent resident status in the United States. In 2000, Ms. Olowo went to the Bahamas and tried to reenter the United States with the alien child of a family friend. The Immigration and Naturalization Service charged Ms. Olowo with removability under § 212(a)(6)(E)(i) of the Immigration and Nationality Act ("INA"), *see* 8 U.S.C. § 1182(a)(6)(E)(i), for knowingly aiding an alien to enter the United States. An immigration judge ("IJ") found

Ms. Olowo removable, and she applied for asylum and withholding of removal on the ground that, if she is returned to Nigeria, her two daughters will be subjected to female genital mutilation. The IJ denied Ms. Olowo's petitions and she appealed both the IJ's finding of removability and the denial of her applications to the Board of Immigration Appeals ("the BIA"). The BIA summarily affirmed the actions of the IJ. Ms. Olowo now petitions for review of the BIA's decision. For the reasons set forth in the following opinion, we deny Ms. Olowo's petition and affirm the decision of the BIA.

# I

## BACKGROUND

### A. Facts

Ms. Olowo was living with her family in Chicago when a family friend, Babatunde Ali (who also was living in Chicago at the time), asked her to travel to the Bahamas and to return with his six-year-old daughter, Grace Ali. Joyce Tunde-Ali—Grace's mother and Mr. Ali's ex-wife— had brought Grace to the Bahamas from Nigeria and now wanted Mr. Ali to send money and airline tickets for Grace, herself and Margaret Ogunosun (another Nigerian) so that they could travel to the United States. At Ms. Tunde-Ali's direction, Mr. Ali purchased the tickets in the names of "Batricia Ann Thompson," "Elease Jennings" and "Lillie Harden." Mr. Ali did not trust Ms. Tunde-Ali to deliver Grace to him as they had agreed; the two were not on the best of terms. He therefore asked Ms. Olowo to deliver the tickets and to return with Grace. Mr. Ali bought Ms. Olowo a round-trip plane ticket to Nassau and gave her the three return tickets.

After she arrived in Nassau, Ms. Olowo found Grace and gave her mother the tickets. The next day Ms. Olowo and Grace (along with Ms. Tunde-Ali and Ms. Ogunosun) returned to the airport and entered inspection before boarding a flight to Chicago. During inspection, Ms. Olowo presented plane tickets, a green card for herself and a birth certificate for Grace bearing the name "Batricia Ann Thompson." When asked by an INS inspector about her relationship to Grace, Ms. Olowo said that she was the child's mother. After initially passing through inspection, Ms. Olowo and Grace were called back because INS inspectors had detained Ms. Tunde-Ali and Ms. Ogunosun for having fraudulent documents, and the inspectors suspected that all four were traveling together. INS inspector George Haas again questioned Ms. Olowo about her relationship to Grace; this time Ms. Olowo said that she was Grace's "godmother" and explained that she had earlier identified herself as Grace's mother because the two terms were interchangeable in Nigerian culture. Inspector Haas examined Grace's birth certificate and doubted its authenticity. Nevertheless, because he was not certain that Grace was not a United States citizen, he let both Grace and Ms. Olowo board the plane and deferred inspection until after their arrival in Chicago.

A few months after her return to Chicago, the INS called in Ms. Olowo for questioning, and she gave a sworn statement about her arrangement with Mr. Ali and the inspection that took place at the airport in Nassau. In her statement, she admitted presenting the birth certificate to INS inspectors before attempting to board the plane with Grace and said that the birth certificate was purchased by Mr. Ali. By this time, the INS had determined that the birth certificate was fraudulent, and they issued Ms. Olowo a Notice To Appear on charges that she was removable because she knowingly had aided Grace, Ms. Tunde-Ali and

Ms. Ogunosun in their attempts to enter the United States, a violation of INA § 212(a)(6)(E)(i).

## B. Administrative Proceedings

### 1. Removal Hearing

At her removal hearing, Ms. Olowo denied knowing anything about Grace's fraudulent birth certificate. She stated that she was not associated with Ms. Tunde-Ali or Ms. Ogunosun and that she knew nothing about their attempt to enter the United States. She denied telling the INS in her sworn statement that she had presented a fake birth certificate before boarding the plane in Nassau or that the birth certificate had been purchased by Mr. Ali; instead she said she actually had answered, "I don't know," to both questions. She also testified that she went to the Bahamas at Mr. Ali's request because he was awaiting an adjustment of status and could not leave the Country, that Mr. Ali gave her a sealed envelope containing Grace's documents, that she presented the envelope at the airport without examining its contents and that she saw the birth certificate only after INS Inspector Haas questioned its authenticity. Ms. Olowo further stated that she knew very little about Grace before going to the Bahamas to pick her up because Mr. Ali—her husband's close friend—never talked about her.

Testifying by telephone, Inspector Haas stated that he had observed Ms. Olowo enter the Nassau airport inspection hall with Grace and the other two women and that he had seen Ms. Olowo give instructions to them before they separated and went into different inspection lines. Inspector Haas was not Ms. Olowo's primary inspector, but he did inspect Ms. Tunde-Ali, who presented conspicuously fraudulent documents bearing the name "Elease Jennings." At another inspection station, a different INS inspector

discovered that Ms. Ogunosun was carrying false documents with the name "Lillie Harden." Because he had seen the group enter the hall together, Inspector Haas had Ms. Olowo and Grace called back to the inspection area for a secondary inspection.

At this secondary inspection, Inspector Haas questioned Ms. Olowo about her relationship to Ms. Tunde-Ali and Ms. Ogunosun. Ms. Olowo first told him that they had been vacationing together in the Bahamas. Meanwhile, at a different INS inspection station, Ms. Ogunosun broke down under questioning and admitted that she was a Nigerian traveling with false documents and that Ms. Olowo was carrying both her Nigerian passport and Ms. Tunde-Ali's in a carry-on bag. A Bahamian constable then retrieved the passports from Ms. Olowo's luggage, and Ms. Olowo changed her story and claimed that she did not really know the women that well and was traveling with them only because they had met in the Bahamas by chance. She claimed that the passports were in her bag because the other women did not have any carry-on luggage, and they had asked her to carry the documents for them.

Both Ms. Tunde-Ali and Ms. Ogunosun were detained pending deportation to Nigeria, but Inspector Haas said that he had allowed Ms. Olowo and Grace to board the plane "out of compassion for the child" because he was unsure about her citizenship. A.R. at 308. However, Grace's Nigerian passport was found in the inspection hall lavatory about a month later, confirming Inspector Haas' suspicion that the child was not Ms. Olowo's and also was not a United States citizen.

The IJ found Ms. Olowo removable and designated Nigeria as the country for removal. The IJ found that the INS had presented sufficient circumstantial evidence to show by clear and convincing evidence that Ms. Olowo had

knowingly aided Grace to enter the United States and had also aided Ms. Tunde-Ali and Ms. Ogunosun in their attempts to enter. In reaching his decision, the IJ determined that Ms. Olowo's testimony was not credible because it was "inconsistent, self-serving, vague, and implausible," and that she had "testified falsely in an attempt to mislead the Court." A.R. at 629. Specifically, the IJ found that Ms. Olowo had lied about her lack of familiarity with Grace, her association with Ms. Tunde-Ali and Ms. Ogunosun and her knowledge of Grace's fraudulent birth certificate and that she had falsely represented herself as Grace's mother to INS inspectors. The IJ concluded that Ms. Olowo was not a "mere patsy," *id.* at 629, but instead an integral part of a scheme to get the three Nigerian nationals into the United States with fraudulent documents:

> Even though [Ms. Olowo] denied that she was involved . . . it is clear from the record that [she] was involved in a scheme, whereby she knew that the child, the child's mother Joyce, and Margaret were all Nigerian citizens who were traveling with false [U.S.] birth certificates. As to the child, it is reasonable to conclude that [Ms. Olowo] was fully aware that her friend's child was an alien who needed proper documents to enter the [U.S.]. It is also evident that [Ms. Olowo] not only carried the child's travel documents and false birth certificate, but also provided false information and documents to the [INS] in order to assist the child to enter the [U.S.] illegally. As to the other two women, [Ms. Olowo] knew that these women were aliens, because of their friendship, and the fact that [she] had in her possession their Nigerian passports while they were presenting false [U.S.] birth certificates to the [INS].

*Id.* at 630-31.

## 2. Asylum Hearing

After the IJ announced his decision, Ms. Olowo applied for asylum and withholding of removal on the ground that she and her twin daughters[1] are members of a social group that is subjected to female genital mutilation ("FGM") in Nigeria, and that she fears that they will undergo this procedure if they return there with her. Ms. Olowo testified that she is from the Yoruba tribe in Nigeria's Oyo state and that she lived in Lagos before she won an immigration visa lottery and came to the United States on October 25, 1995. She stated that the Yoruba tribe still practices FGM, and that she had been subjected to the procedure herself when she was twelve years old. Ms. Olowo further stated that, if she returns with her daughters to Nigeria, her husband's family will force her daughters to undergo FGM and that she and her husband will be unable to protect the children because FGM is a tribal tradition and a "cultural requirement." A.R. at 430, 457. Ms. Olowo also claimed that she could not relocate to another part of Nigeria to protect her daughters because her husband's family would eventually find them and subject her daughters to FGM. Ms. Olowo said that, even though her daughters and her husband are legal permanent residents and could remain in the United States, the whole family will have to return to Nigeria if she is removed because her husband would not be able to care for the children on his own.

The IJ denied Ms. Olowo's application for asylum because she has already been subjected to FGM, and therefore no longer has a well-founded fear of persecution based on any

---

[1] Ms. Olowo's daughters, Elizabeth and Comfort, were born on December 14, 1990, and arrived in the United States with Ms. Olowo on October 25, 1995.

social group comprised of women who feared FGM. The IJ further determined that Ms. Olowo could not "bootstrap a claim for asylum based upon fear of harm to her children" because they and their father are legal permanent residents in the United States and would not be required to return to Nigeria with their mother. *Id.* at 29. As an alternate ground for his decision, the IJ concluded that, even if Ms. Olowo's family did return with her to Nigeria, her husband would be able to prevent his daughters from undergoing FGM. The IJ based this conclusion on a 1997 State Department report that discusses the father's traditional role in the practice of FGM in Nigeria: "Under Nigerian Tradition, the father has control over the children. If the father opposes FGM, therefore, the children would almost certainly be safe." Bureau of Democracy, Human Rights and Labor, U.S. Dep't of State, Nigeria—Profile of Asylum Claims and Country Conditions (1997); A.R. at 474. The IJ noted that, despite this information, Ms. Olowo and her husband had "decided that they would go along with such circumcision and they would not live in any other part of Nigeria." A.R. at 30. The IJ then determined that, although Ms. Olowo's testimony at the hearing was credible, she did not "advance[] a credible claim for asylum." *Id.* at 26, 30. The IJ also found that her petition for withholding of removal necessarily failed because such a claim requires an even higher standard of proof. The IJ then ordered her removed to Nigeria.

   Ms. Olowo appealed the IJ's decision that she was removable and not entitled to asylum or withholding of removal. The BIA summarily affirmed the IJ's decision without a written opinion.

## II

## DISCUSSION

### A. The BIA's Streamlining Procedure

Ms. Olowo first argues that the BIA abdicated its responsibility to review the IJ's decision when it employed its streamlined review procedure and affirmed the IJ's decision without an opinion. We have held, however, that "it makes no practical difference whether the BIA properly or improperly streamlined review" when, as here, we can review directly the decision of the IJ. *Georgis v. Ashcroft*, 328 F.3d 962, 967 (7th Cir. 2003); *see also Ciorba v. Ashcroft*, 323 F.3d 539, 546 (7th Cir. 2003). We, therefore, need not consider the INS' alternative argument that the BIA's decision to streamline is not reviewable because the streamlining procedure is an action committed to the BIA's discretion. *See Georgis*, 328 F.3d. at 967.

### B. Removability

Ms. Olowo next submits that the IJ erred in concluding that the INS met its burden to prove, by clear and convincing evidence, that she is removable for knowingly aiding Grace and the two Nigerian women to enter the United States. She contends that the IJ impermissibly tipped the scales in the INS' favor when he discredited her testimony, even though it was "consistent and reliable," Pet'r Br. at 14, and instead gave dispositive weight to unreliable INS evidence that included inaccurate reports by an INS officer and confusing hearsay testimony by Inspector Haas.

Because Ms. Olowo is an alien with lawful permanent resident status, the INS can remove her only if it establishes, by clear and convincing evidence, that she is removable. *See*

*Sandoval v. INS*, 240 F.3d 577, 581 (7th Cir. 2001); 8 U.S.C. § 1229a(c)(3)(A); 8 C.F.R. § 1240.8(a). An IJ's decision that the INS has met its burden will be upheld as long as it is based on "reasonable, substantial, and probative evidence." 8 U.S.C. § 1229a(c)(3)(A). When the IJ bases evidentiary findings on credibility determinations, those determinations are reviewed deferentially and will be upheld if supported by " 'specific, cogent reasons' that 'bear a legitimate nexus to the finding.' " *Oforji v. Ashcroft*, 354 F.3d 609, 613 (7th Cir. 2003) (quoting *Ahmad v. INS*, 163 F.3d 457, 461 (7th Cir. 1999)).

The IJ's reasoning is more than sufficient to support his adverse credibility finding. The IJ found that Ms. Olowo's testimony was incredible because it was "inconsistent, self-serving, vague, and implausible." A.R. at 629. He noted that Ms. Olowo changed her story several times, both when questioned by INS inspectors at the airport and also at the hearing when she disputed the answers that she had given in her sworn statement. The IJ noted as well that her testimony was inconsistent with documentary evidence and other testimony presented by the INS. For instance, Ms. Olowo testified that she did not know that she was carrying a fraudulent birth certificate for Grace and that she did not know Ms. Tunde-Ali or Ms. Ogunosun. Yet, the INS found Grace's discarded passport in the airport inspection hall lavatory and Ms. Tunde-Ali's and Ms. Ogunosun's passports in Ms. Olowo's baggage. Numerous inconsistencies and contradictions in an alien's testimony provide a substantial basis for an IJ to discredit it. *See Oforji*, 354 F.3d at 614; *Khano v. INS*, 999 F.2d 1203, 1208 (7th Cir. 1993); *Loulou v. Ashcroft*, 354 F.3d 706, 709-10 (8th Cir. 2003).

Ms. Olowo also submits that the IJ improperly credited factually inaccurate reports by INS Officer Deborah Eades that were not based entirely on personal knowledge, as well

as confusing hearsay testimony by Inspector Haas concerning the sequence of the INS' investigation of Ms. Olowo at the airport. Ms. Olowo contends that this evidence was unreliable.

Conventional rules of evidence do not apply in immigration proceedings, which are governed only "by the looser standard of due process of law." *Niam v. Ashcroft*, 354 F.3d 652, 659 (7th Cir. 2004). As long as evidence is probative and its use is not fundamentally unfair, it is admissible. *See Rosendo-Ramirez v. INS*, 32 F.3d 1085, 1088 (7th Cir. 1994).

To the extent that portions of Officer Eades' reports were not reliable, the IJ addressed this problem by not relying on them in his analysis. Ms. Olowo objected to Officer Eades' reports at the hearing because they contained a minor factual inaccuracy about the dates when Ms. Olowo testified at the INS' Chicago office, and also detailed the results of surveillance of Ms. Olowo's residence that Officer Eades did not conduct herself. The IJ noted Ms. Olowo's objections and sufficiently addressed her concerns by limiting the weight accorded the reports.

Inspector Haas' testimony about the sequence of events at the airport was not necessarily "confused" and "inconsistent," Pet'r Br. at 15, nor was it largely based on hearsay. On two occasions, the inspector referred to his inspection of Ms. Olowo as "primary" rather than "secondary," but his account of the relevant facts was otherwise completely consistent. The only facts about Ms. Olowo's airport inspection that Inspector Haas related second-hand were the answers that Ms. Olowo had given when she first entered the inspection area and was questioned by an INS inspector. Although hearsay, this testimony passes the due process test for admissibility: It was probative, in that it tended to show that Ms. Olowo tried to deceive INS inspectors both initially and when later questioned, and its use was not fundamen-

tally unfair because Ms. Olowo had the opportunity to cross-examine Inspector Haas and offer rebuttal testimony. In a due process analysis, problems of fundamental fairness associated with hearsay testimony are dispelled when the testimony is subject to cross-examination. *See Rojas-Garcia v. Ashcroft*, 339 F.3d 814, 823-24 (9th Cir. 2003).

Moreover, even if the IJ had disregarded this testimony, the INS still produced more than enough circumstantial evidence to show that Ms. Olowo knowingly aided Grace and the two Nigerian women in their attempts to enter the United States. *See Sanchez-Marquez v. INS*, 725 F.2d 61, 63 (7th Cir. 1984) (allowing proof by circumstantial evidence that the petitioner knowingly assisted seven aliens to enter the United States). Once the IJ determined that Ms. Olowo's testimony was not credible, the remaining evidence over-whelmingly supported the INS' version of the events.

Because the IJ's decision to discredit Ms. Olowo's testi-mony and rely instead on the INS' evidence was not im-proper, substantial evidence supports his finding that the INS met its burden to prove by clear and convincing evidence that Ms. Olowo is removable.

## C. Asylum and Withholding of Deportation

Ms. Olowo's final argument is that the IJ erred in finding that she did not "advance[] a credible claim for asylum," A.R. at 30, despite finding that she credibly testified at her asylum hearing. Ms. Olowo contends that the IJ should have believed her when she stated that, if she and her family returned to Nigeria, "she would have no choice under the Nigerian Customary Law than to allow the FGM on her daughters." Pet'r Br. at 18.

The IJ did conclude that Ms. Olowo's asylum claim failed in part because a 1997 State Department Profile of Asylum Claims rebutted her testimony that she would have no choice under Nigerian custom and tradition but to allow her daughters to undergo FGM. This determination, however, was not the primary reason why the IJ denied her asylum claim. The IJ denied her claim because she did not present any evidence to show that she fears future persecution herself (she had already been subjected to FGM), and because her daughters and her husband are legal permanent residents here and will not be forced to return to Nigeria with her.

In order to qualify for refugee status and thus be granted asylum, it is Ms. Olowo's burden to demonstrate that she has either endured past persecution or has a well-founded fear of future persecution based on one of the statutorily protected categories. *See Yadegar-Sargis v. INS*, 297 F.3d 596, 601 (7th Cir. 2002). Similarly, to show that she is entitled to withholding of deportation, she must demonstrate that it is more likely than not that she will be subjected to persecution if removed to Nigeria. *See Toptchev v. INS*, 295 F.3d 714, 720 (7th Cir. 2002). Notably, both of these standards require an applicant to demonstrate that she herself will be subject to persecution if removed, and do not encompass any consideration of persecution that may be suffered by others—even family members—who may be obliged to return with her to Nigeria.[2] *See Oforji*, 354 F.3d at 615.

---

[2] Although current immigration laws do not allow an IJ to factor in potential hardship to a petitioner's lawful resident or citizen family members when considering an asylum claim, *see Oforji v. Ashcroft*, 354 F.3d 609, 618 (7th Cir. 2003), such considerations are relevant when evaluating an application for cancellation of

(continued...)

Ms. Olowo's applications for asylum and withholding of deportation are both based on her fear that her daughters will be subjected to FGM. Such claims for "derivative asylum" based on potential harm to an applicant's children are cognizable only when the applicant's children are subject to "constructive deportation" along with the applicant. *Oforji*, 354 F.3d at 615; *see also* 8 U.S.C. § 1158(b)(3) ("A spouse or child of an alien who is granted asylum . . . may, if not otherwise eligible for asylum . . . , be granted the same status as the alien if accompanying, or following to join, such alien."); *cf. Salameda v. INS*, 70 F.3d 447, 451 (7th Cir. 1995) (directing the BIA to consider hardship to an alien's non-citizen child who would be "constructively deported" along with his parents). But in this case, both of Ms. Olowo's daughters are legal permanent residents, as is their father, and when there is a parent who is available to care for the daughters in the United States, they are under no compulsion to leave. Accordingly, the facts presented here do not support a claim for derivative asylum.[3]

_____

(...continued)
removal, *see* 8 U.S.C. § 1229b(a); *see also Oforji*, 354 F.3d at 620 (Posner, J., concurring). However, Ms. Olowo is not eligible for this form of relief because she did not reside in the United States for the requisite seven-year period before the INS filed its Notice To Appear. *See* 8 U.S.C. § 1229b(a).

[3] At oral argument, counsel for the Department of Homeland Security ("DHS") stated that, to her knowledge, Mr. Olowo has not been charged with removability in connection with Ms. Olowo's attempts to help Grace and the two Nigerian women enter the United States. Counsel further stated that the DHS had no plans to charge Mr. Olowo. We further note that, if the DHS does charge Mr. Olowo, his nine-year residency in the United States will make him eligible for cancellation of removal, and an
(continued...)

Ms. Olowo did not demonstrate that, if removed to Nigeria, she herself would face persecution on account of her membership in a social group. Thus, we see no reason to disturb the IJ's finding that she is not entitled to either asylum or withholding of removal based on the possibility that her daughters, who are not required to leave the United States, may be subjected to FGM in Nigeria.

Our determination that the IJ correctly denied Ms. Olowo's applications for asylum and withholding of removal does not end our inquiry into her case. We are concerned deeply by the representations that Ms. Olowo made at her administrative hearing that, if removed, she would take her daughters back to Nigeria and allow them to be subjected to FGM. Ms. Olowo may have made these statements in an attempt to strengthen her asylum claim and to encourage the IJ to grant her application, but we cannot overlook the fact that Ms. Olowo has announced in an official proceeding her intention to allow her daughters to face FGM in Nigeria rather than arrange for them to remain in the United States.[4]

---

(...continued)
IJ considering such an application would be required to consider any resulting hardship to his two daughters if he were removed to Nigeria. *See* 8 U.S.C. § 1229b(a); *Cerrillo-Perez v. INS*, 809 F.2d 1419, 1425-26 (9th Cir. 1987).

[4] The following exchange took place at the hearing when Ms. Olowo was questioned by the IJ and INS attorney Christine Young:

IJ:        [I]f you think that it's going to be so hard on your children that you cannot take them there, between having the options of taking your chil-
(continued...)

   We have previously discussed in some detail the practice
of FGM, which is "a horrifically brutal procedure, often
performed without anesthesia" that causes both short- and
long-term physical and psychological consequences.
*Nwaokolo v. INS*, 314 F.3d 303, 308-09 (7th Cir. 2002) (per
curiam); *see also Abankwah v. INS*, 185 F.3d 18, 23 (2d Cir.
1999) ("FGM, which is often performed under unsanitary
conditions with highly rudimentary instruments, is 'ex-
tremely painful,' 'permanently disfigures the female gen-
italia, [and] exposes the girl or woman to the risk of serious,
potentially life-threatening complications,' including
'bleeding, infection, urine retention, stress, shock, psycho-
logical trauma, and damage to the urethra and anus.' "
(quoting *In re Kasinga*, 21 I. & N. Dec. 357 (BIA 1996))). And
despite what cultural significance societies in other nations
may attach to the practice, *see Oforji*, 354 F.3d at 619 (Posner,
J., concurring), FGM, when inflicted on minors, is a federal

---

(...continued)

             dren to Nigeria . . . and . . . leaving them
             here . . . which one do you think would you
             choose?

  Ms. Olowo:  I can't take them to Nigeria and I can't leave
             them here. I don't know.

  IJ:        So you have no choice?

  Ms. Olowo:  I have no choice.

                   . . . .

  Ms. Young:  So if you went back to Nigeria, you would
             agree to have them circumcised . . .?

  Ms. Olowo:  Yes.

A.R. at 454, 456-57.

crime. *See* 18 U.S.C. § 116.[5] It is also prohibited in Illinois, *see* 720 Ill. Comp. Stat. 5/12-34,[6] as well as in other nations, *see,*

---

[5] The full text of 18 U.S.C. § 116 provides:

(a) Except as provided in subsection (b), whoever knowingly circumcises, excises, or infibulates the whole or any part of the labia majora or labia minora or clitoris of another person who has not attained the age of 18 years shall be fined under this title or imprisoned not more than 5 years, or both.

(b) A surgical operation is not a violation of this section if the operation is—

(1) necessary to the health of the person on whom it is performed, and is performed by a person licensed in the place of its performance as a medical practitioner; or

(2) performed on a person in labor or who has just given birth and is performed for medical purposes connected with that labor or birth by a person licensed in the place it is performed as a medical practitioner, midwife, or person in training to become such a practitioner or midwife.

(c) In applying subsection (b)(1), no account shall be taken of the effect on the person on whom the operation is to be performed of any belief on the part of that person, or any other person, that the operation is required as a matter of custom or ritual.

[6] The full text of 720 Ill. Comp. Stat. 5/12-34 provides:

(a) Except as otherwise permitted in subsection (b), whoever knowingly circumcises, excises, or infibulates, in whole or in part, the labia majora, labia minora, or clitoris of another commits the offense of female genital mutilation. Consent to the procedure by a minor on whom it is performed or by the minor's parent or guardian is not a defense to a violation of this Section.

(continued...)

*e.g.*, Female Genital Mutilation Act, 2003, c. 31 (Eng.); *see also UK: New Female Circumcision Bill Closes Loophole*, ANSA-Eng. Media Serv., Mar. 3, 2004, at 1, *available at* 2004 WL 64006952 ("Parents who take their daughters abroad to undergo genital circumcision will be sentenced to up to 14 years of prison under a new law."), and has been roundly criticized by the international community, *see Abankwah*, 185 F.3d at 23 (citing United Nations reports criticizing the practice of FGM). The notion that Ms. Olowo's daughters will be removed to Nigeria and subjected to this brutal procedure offends our sense of decency, and allowing Ms. Olowo to make this decision unilaterally disregards the legal rights of the children.[7] *See Polovchak v. Meese*, 774 F.2d 731 (7th Cir.

─────────────

(...continued)

> (b) A surgical procedure is not a violation of subsection (a) if the procedure:
>
>> (1) is necessary to the health of the person on whom it is performed and is performed by a physician licensed to practice medicine in all of its branches; or
>>
>> (2) is performed on a person who is in labor or who has just given birth and is performed for medical purposes connected with that labor or birth by a physician licensed to practice medicine in all of its branches.
>
> (c) Sentence. Female genital mutilation is a Class X felony.

[7] Although federal courts generally do not interfere in family matters, *see Lossman v. Pekarske*, 707 F.2d 288, 292 (7th Cir. 1983), we do have the duty to act within the bounds of our authority when an individual may be removed from the United States and subjected to "procedures or punishment 'antipathetic to a federal court's sense of decency.' " *In re Burt*, 737 F.2d 1477, 1485 n.11 (7th Cir. 1984) (quoting *Gallina v. Fraser*, 278 F.2d 77, 79 (2d Cir. 1960)); *see also Nwaokolo*, 314 F.3d at 308 (granting a stay of

(continued...)

1985); *cf. Prince v. Massachusetts*, 321 U.S. 158, 170 (1944) ("Parents may be free to become martyrs themselves. But it does not follow they are free . . . to make martyrs of their children before they have reached the age of full and legal discretion when they can make that choice for themselves.").

At oral argument, we asked counsel for the DHS if the Department had alerted state authorities that Ms. Olowo had expressed the intent to expose her daughters to the threat of FGM. Counsel replied that, to her knowledge, the DHS had not, but she undertook to relay our concerns to the Department.[8] We trust that the DHS will address this

---

(...continued)

deportation when it was arguable that "the BIA abused its discretion in denying Ms. Nwaokolo's motion to reopen if it failed to consider the threat that [her] four-year old daughter Victoria will be subjected to FGM as direct consequence of the decision to remove her mother"); *Ejelonu v. INS*, 355 F.3d 539, 544-53 (6th Cir. 2004) (*sua sponte* construing petition for review as a request for a writ of *audita querela*, and granting the writ to prevent the DHS from using a juvenile's probation sentence for embezzlement as basis for removing her to Nigeria); *Casem v. INS*, 8 F.3d 700, 702-03 (9th Cir. 1993) (instructing the BIA to consider the effect Ms. Casem's deportation to the Philippines would have on her nine-year-old son, despite the absence of any requirement in the statute that the BIA consider hardship to an alien's family when considering whether to waive deportation).

[8] The DHS' predecessor organization, the INS, previously interceded to prevent alien parents from returning their son to the former Soviet Union, where he potentially faced persecution because of his religion. *See Polovchak v. Meese*, 774 F.2d 731 (7th Cir. 1985). In that case, the INS suggested that the state of Illinois institute proceedings to terminate the parents' custody rights. *See*

(continued...)

situation and inform the Illinois state authorities that, despite the children's right to remain in the United States, Ms. Olowo plans to take her daughters with her to Nigeria to face what she characterizes as the very real possibility that they may be subjected to FGM.

We also direct the Clerk of this court to send a copy of this opinion to the appropriate office of the Illinois Department of Children and Family Services, *see* 325 Ill. Comp. Stat. 5/1 et seq. (the "Abused and Neglected Child Reporting Act"), and the Illinois State's Attorney for Cook County, whose duty it is to represent the people of the State of Illinois in proceedings under the Juvenile Court Act of 1987, *see* 705 Ill. Comp. Stat. 405/1-6, which protects minors from parents who allow acts of torture to be committed on minors, *see* 705 Ill. Comp. Stat. 405/2-3(2)(iv). In proceedings under the Juvenile Court Act, Ms. Olowo's daughters will be afforded the opportunity that immigration proceedings do not provide—representation of their best interests.[9] *See* 705 Ill.

---

(...continued)

*id.* at 732-33. The INS then assisted the child in applying for asylum and even went so far as to issue a "departure control order," *see* 8 U.S.C. § 1185; 8 C.F.R. § 215.3, to prevent the child's parents from removing him to the Soviet Union. *See Polovchak*, 774 F.2d at 732-33.

[9] Children of removable aliens do not have a right to representation in immigration proceedings unless they themselves are charged with removability. This is a flaw in the system and a problem that has long concerned us, *see Salameda v. INS*, 70 F.3d 447, 451 (7th Cir. 1995), because in such situations there is a potential conflict between the parents' interests and those of the children. Ms. Olowo's daughters are both thirteen years old. They therefore are at least at the "lower end of an age range in which a minor may be mature enough to assert certain individual rights

(continued...)

Comp. Stat. 405/2-17 (directing appointment of a guardian ad litem to represent the best interests of the minor when a petition is filed alleging that the minor is an abused or neglected child).

We assume that state authorities also would assess and assert the rights of the children under the International Child Abduction Remedies Act, 42 U.S.C. §§ 11601-11610, and Article 13(b) of the Hague Convention on the Civil Aspects of International Child Abduction, *opened for signature* Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 ("the Hague Convention"). *Cf. Danaipour v. McLarey*, 286 F.3d 1 (1st Cir. 2002) (remanding case for determination of whether

---

(...continued)
that equal or override those of [their] parents." *Polovchak*, 774 F.2d at 736; *see also Johns v. Dep't of Justice*, 624 F.2d 522, 524 (5th Cir. 1980) (directing the INS to ensure that a five-year-old child is represented by a guardian ad litem in deportation proceedings). *But cf. Gonzalez v. Reno*, 212 F.3d 1338, 1351 (11th Cir. 2000) (finding that the INS' determination "that six-year-old children lack sufficient capacity to assert, on their own, an asylum claim—is [not] unreasonable"). The children should, therefore, have the benefit of an impartial advocate to assist them in expressing whether they wish to return to Nigeria and possibly face FGM. *See, e.g., Crommelin-Monnier v. Monnier*, 638 So. 2d 912, 916 (Ala. Civ. App. 1994) ("When a trial court is faced with the proposed removal of minor children to a foreign country, the appointment of a guardian ad litem for each child for the protection of their best interests will be required."); Unaccompanied Alien Child Protection Act, H.R. 3361, 108th Cong. (2003) (proposed law would require appointment of counsel or guardian ad litem for inadmissible alien children); Peter Margulies, *Children, Parents, and Asylum*, 15 Geo. Immigr. L.J. 289, 301-02 (2001) (discussing necessity for independent representation for minors in immigration proceedings).

sexual abuse occurred in order to evaluate, under Article 13(b) of the Hague Convention, whether children would be returned to situation of grave risk or intolerable conditions); *Blondin v. DuBois*, 238 F.3d 153 (2d Cir. 2001) (affirming, under Article 13(b) of the Hague Convention, the district court's refusal to repatriate children because of likelihood that repatriation would subject children to recurrence of acute, severe traumatic stress disorder stemming from prior abuse); *Walsh v. Walsh*, 221 F.3d 204 (1st Cir. 2000) (ordering district court to dismiss father's petition under the Hague Convention because, given father's pattern of violence and spousal abuse, grave risk of physical harm to children existed and, therefore, Article 13(b) exception applied).

## Conclusion

For the foregoing reasons, the petition for review is denied, and the judgment of the BIA is affirmed. Further, the Clerk of this court is directed to send a copy of this opinion to the Illinois Department of Children and Family Services and the Illinois State's Attorney for Cook County.

AFFIRMED

A true Copy:

       Teste:

              _____
              *Clerk of the United States Court of*
                *Appeals for the Seventh Circuit*