Almaz Sayoum ABEBE; Sisay
Mengistu, Petitioners,

v.

John ASHCROFT, Attorney
General, Respondent.

No. 02–72390.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 4, 2003.

Filed Aug. 13, 2004.

Philip Hornik, Portland, OR, for the petitioners.

Nancy E. Friedman (briefed) and Colette J. Winston (argued), Office of Immigration Litigation, U.S. Department of Justice, Washington, D.C., for the respondent.

Before ALARCÓN, FERGUSON, and RAWLINSON, Circuit Judges.

RAWLINSON, Circuit Judge:

Sisay Mengistu (Mengistu) and his wife, Almaz Sayoum Abebe (Abebe), citizens of Ethiopia, petition for review of an order of the Board of Immigration Appeals (BIA) affirming the denial of their applications for asylum and withholding of removal. We have jurisdiction pursuant to 8 U.S.C. § 1105a.[1] Because Mengistu has not shown that a reasonable fact-finder would be compelled to find that he suffered past persecution or has a well-founded fear of future persecution, we **DENY** his petition for review.

## I. BACKGROUND & PROCEDURAL HISTORY

Mengistu entered the United States in 1990, and Abebe entered in 1993. Mengistu applied for asylum in July, 1993. Abebe's asylum claim is derivative of Mengistu's.

Mengistu's father and stepmother were involved with the then controlling government in Ethiopia, the DERG, a Marxist Leninist dictatorship ruled by Mengistu Haile Mariam (no relation to Petitioner). Petitioner Mengistu's father and stepmother were imprisoned and stripped of their civil rights by the succeeding government, the Ethiopian Peoples Revolutionary Democratic Front (EPRDF). Mengistu was, but no longer is, a member of the Ethiopian People's Revolutionary Party (EPRP), an organization critical of the DERG regime. In 1981, Mengistu was imprisoned for a few days because of his membership in EPRP, and underwent indoctrination after his release. In 1991, the DERG regime was overthrown by the EPRDF, and the Transitional Government of Ethiopia (TGE) assumed control.

Mengistu and Abebe married in 1988. In 1990, at a time when DERG was still in power, Mengistu came to the United States to study at Oregon State University. Abebe did not join Mengistu in the United States until 1993, because they did not want the government to suspect that Mengistu was not returning to Ethiopia. After bribing a clerk with the equivalent of

---

1. "Because removal proceedings against [Mengistu] were pending before April 1997, and the BIA issued its final decision after October 1996, we apply the transitional rules of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ('IIRIRA'), Pub.L. No. 104–208, 110 Stat. 3009. We therefore have jurisdiction over the asylum claim under 8 U.S.C. § 1105a." *Vukmirovic v. Ashcroft,* 362 F.3d 1247, 1251 (9th Cir. 2004) (citation omitted).

$125, Abebe obtained a visa to travel to the United States.

Mengistu does not support the TGE. In 1993, he joined Medhin, a multi-ethnic organization that opposed the TGE and sought a democratic government. Medhin's focus is on creating change through politics. However, some members endorse violence as a method to effect change. As a member, Mengistu received materials from Medhin and attended a Medhin conference in 1996 in Washington, D.C. Mengistu is concerned that the Ethiopian embassy may acquire the attendance list of that meeting and identify him as a Medhin member.

Mengistu fears imprisonment if he returns to Ethiopia because of his opposition to the controlling government. He testified that his fears are substantiated by articles he has read in the magazine *Ethiopian Observer*, detailing extrajudicial killings of opposition members. Mengistu also bases his fear upon general stories he has heard from other Medhin members relating the imprisonment of Medhin supporters who returned to Ethiopia. Mengistu, however, offered no specific facts, such as names or dates, to support his general statements.

Mengistu also expressed his fear that he would not find work because of his affiliation with Medhin. Mengistu suspects that his opinions regarding the current government are known in Ethiopia because his former roommate has returned to Ethiopia to publish a magazine. Mengistu's friend, Badege Bishaw, testified that if Mengistu returns to Ethiopia, he is in danger if the Ethiopian officials know of his affiliation with Medhin.

In addition to his fear that he may be discriminated against for his political views, Mengistu also fears that his daughter would be subjected to female genital mutilation (FGM) if they return to Ethio-

pia. Mengistu testified that the family controls whether a girl is subjected to FGM and that he could likely stop the procedure from occurring as long as he was not imprisoned. Abebe was a victim of FGM when she was a baby, and she testified that she would not allow her daughter to undergo FGM, even though she would be ostracized by her family.

The Immigration Judge (IJ) found that Mengistu and Abebe did not establish either past persecution or a well-founded fear of persecution should they return to Ethiopia. The IJ placed substantial weight upon the fact that Mengistu joined Medhin in late 1993, after applying for asylum on July 13, 1993. The IJ stated:

> With regard to the respondent's membership in the Medhin, the Court was struck at first by the fact that it appeared to be an act of "bootstrapping;" that is to say that the respondent joined an organization which is opposed to the present government of Ethiopia at a time when his own status in this country and his own right to stay in this country was at issue. It would seem to the Court very reckless to join an opposition party and then flaunt it when he faces possible deportation to that country unless it is a ploy to insure [sic] that he would face persecution so that the asylum claim would have to be granted.

However, the IJ did not specifically decide whether Mengistu's membership in Medhin was a ploy, because the IJ found that Mengistu had not established a well-founded fear of persecution were he and his family to return to Ethiopia.

The IJ relied upon the State Department Country Report on Ethiopia. The IJ found that, based on the 1994 Country Report, individuals who renounce violence were not likely to face persecution in Ethiopia, because the government was most

concerned with organizations that advocate the violent overthrow of the government. The IJ reasoned that because Mengistu was willing to renounce violence, it was unlikely he would suffer persecution. The IJ also noted that Mengistu's participation in Medhin was minimal, as he only attended a conference.

The IJ ruled that there was not much of a threat of FGM being enforced upon Mengistu's daughter. The IJ explained that because FGM is a decision made by the family, and as Mengistu and Abebe have decided not to allow their daughter to undergo FGM, the daughter faces no real threat of subjection to FGM.

Petitioners appealed to the BIA. The BIA issued a summary ruling adopting the IJ's decision.

## II. STANDARD OF REVIEW

When the BIA issues a summary decision adopting the decision of the IJ, we review the IJ's decision as the final agency decision. *Falcon Carriche v. Ashcroft*, 335 F.3d 1009, 1014 (9th Cir.2003). "Within broad limits the law entrusts the agency to make the basic asylum eligibility decision...." *Gonzalez–Hernandez v. Ashcroft*, 336 F.3d 995, 998 (9th Cir.2003) (citation omitted). The agency's final decision is reviewed to determine whether it is supported by substantial evidence. *Id.* Specifically, we may overturn the BIA's denial of asylum only if the applicant shows "that the evidence he presented was so compelling that no reasonable fact finder could fail to find the requisite fear of persecution." *Id.* (citations omitted).

## III. DISCUSSION

To be eligible for asylum protection, the Petitioner must show that he is a refugee, defined as one "who is unable or unwilling to return to [Ethiopia] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Melkonian v. Ashcroft*, 320 F.3d 1061, 1064 (9th Cir.2003) (citing 8 U.S.C. § 1101(a)(42)(A)) (internal quotation marks omitted). The petitioner's fear of persecution must be "subjectively genuine and objectively reasonable." *Nagoulko v. INS*, 333 F.3d 1012, 1016 (9th Cir.2003) (citation omitted).

The subjective component may be satisfied by credible testimony that Petitioner genuinely fears persecution. *Id.* "To satisfy the objective component, [Petitioner] must show that [Petitioner] has suffered from past persecution (which then gives rise to a rebuttable presumption of future persecution) or that [Petitioner] has a good reason to fear future persecution by adducing credible, direct, and specific evidence in the record of facts that would support a reasonable fear of persecution." *Id.* (citation and internal quotation marks omitted).

Persecution, as defined by the Ninth Circuit, is "the infliction of suffering of harm upon those who differ (in race, religion, or political opinion) in a way regarded as offensive." *Id.* (citation omitted). "Persecution, however, is an extreme concept that does not include every sort of treatment our society regards as offensive." *Id.* (citation and internal quotation marks omitted).

Mengistu has not shown that he objectively and subjectively fears persecution. Mengistu's detention in 1981 does not rise to the level of past persecution. *See Al–Saher v. INS*, 268 F.3d 1143, 1146 (9th Cir.2001) (holding that a five to six-day detention, without abuse, does not amount to persecution). Mengistu does not have a well-founded fear of persecution based upon his involvement with Medhin, because *no* threats have been made to

Mengistu for his involvement in Medhin. *See Singh v. INS*, 134 F.3d 962, 968 (9th Cir.1998) (holding that we are unlikely to find persecution where there is no significant physical violence or specific threats of serious harm).

Moreover, Mengistu's fear that he may not be able to find work if he returns to Ethiopia does not compel a finding of a well-founded fear of persecution. *Nagoulko*, 333 F.3d at 1016 (holding that employment discrimination "is not the type of economic deprivation that rises to the level of persecution").

■ Finally, although a closer case, Mengistu's concern that his daughter would be subjected to FGM does not rise to the level of a well-founded fear of persecution under the facts of this case. Both Mengistu and Abebe testified that they would not allow their daughter to undergo FGM, even though they might be ostracized by their families. *See Kazlauskas v. INS*, 46 F.3d 902, 907 (9th Cir.1995) (holding that ostracism is not persecution). Specifically, Mengistu testified that "I will try to do whatever I can to stop [the FGM procedure,]" and Abebe testified that she was not willing to allow her daughter to be subjected to FGM and that she faced rejection from her family for this decision.

Likewise, the record reflects that in Ethiopia "women are able to prevent their daughters from being subjected to [FGM] by relatives." *See* United States Department of State, *Ethiopia—Profile of Asylum Claims & Country Conditions* 5 (Dec. 1994).

The facts are dissimilar in the Second Circuit case predicating a finding of persecution on a fear of subjection to FGM. The most important distinction is that in *Abankwah v. INS*, 185 F.3d 18, 24 (2nd Cir.1999), the asylum applicant herself faced FGM, and in Ghana, not Ethiopia. Additionally, the applicant had no control over her tribe's decision to inflict FGM as a punishment for engaging in premarital sex in violation of a tribal taboo. It was inevitable that the tribe would discover that the alien had engaged in premarital sex during the "enstooling" of the alien as the tribe's Queen Mother. *Id.* at 20, 24. In contrast to the applicant in *Abankwah*, Mengistu and Abebe have not established that the subjection of their daughter to FGM is inevitable or even probable.

We are aware that the Sixth Circuit recently remanded a FGM-based asylum case involving a mother and daughter from Ethiopia for further development of the record. However, we are not persuaded that the same result is warranted in this case. As an initial matter, we note that the Sixth Circuit's decision in *Abay v. Ashcroft*, 368 F.3d 634 (6th Cir.2004) found potential social ostracism sufficient to support a claim of persecution, a finding not consistent with our precedent. *Compare Abay*, 368 F.3d at 640, *with Kazlauskas*, 46 F.3d at 907.

Additionally, the facts in *Abay* are dissimilar to the facts in this case. In *Abay*, the mother testified that "she would not be able to prevent a future husband or his relatives from demanding that [FGM] be done." *Abay*, 368 F.3d at 640. In contrast, Mengistu and Abebe indicated in their testimony that they would be able to protect their daughter from forced FGM, even though they might face ostracism. Also unlike this case, in *Abay* the daughter had filed an individual application for asylum and testified about her fear of FGM.

Finally, we are constrained by the deferential standard of review we must apply. *Gonzalez–Hernandez*, 336 F.3d at 998. Although a reasonable factfinder *could* have found a fear of persecution on this record, a finding of persecution is not *com-*

*pelled* by the facts of this case. *See Nagoulko,* 333 F.3d at 1018.

Because Abebe and Mengistu failed to satisfy the lesser standard required for asylum, they necessarily fail to satisfy the standard for withholding of removal. *See Khourassany v. INS,* 208 F.3d 1096, 1101 (9th Cir.2000).

## IV. CONCLUSION

The IJ's finding that Abebe and Mengistu do not have a well-founded fear of persecution was supported by substantial evidence.

### PETITION DENIED.

FERGUSON, Circuit Judge, dissenting:

Female genital mutilation ("FGM") imperils the health and human rights of more than one million women and girls each year. As recognized by the Board of Immigration Appeals ("BIA") decision establishing FGM as a basis for asylum, the effects of the procedure can be severe:

> FGM is extremely painful and at least temporarily incapacitating. It permanently disfigures the female genitalia. FGM exposes the girl or woman to the risk of serious, potentially life-threatening complications. These include, among others, bleeding, infection, urine retention, stress, shock, psychological trauma, and damage to the urethra and anus. It can result in permanent loss of genital sensation and can adversely affect sexual and erotic functions.

*In re Fauziya Kasinga,* 21 I. & N. Dec. 357 at *10–11 (B.I.A.1996) (en banc) (internal citation omitted).

In addition to the physical effects of the procedure, FGM "may leave a lasting mark on the life and mind of the woman who has undergone it," causing her to experience" feelings of incompleteness, anxiety and depression." World Health Organization, Fact Sheet: Female Genital Mutilation (2000), http://www.who.int/mediacentre/factsheets/fs241. FGM has been recognized as a violation of international human rights and, in response to reports of its practice among immigrants to this country, criminalized under U.S. law. *See Abankwah v. INS,* 185 F.3d 18, 23 (2d Cir.1999).

The practice is pervasive in Ethiopia, the country of origin of petitioners Mengistu and Abebe. The U.S. State Department Ethiopia Country Report on Human Rights Practices for 1996, included in the record, stated that almost all girls in Ethiopia undergo some form of FGM, and noted that the practice was discouraged by the government but not prohibited. FGM in Ethiopia usually involves either the removal of the clitoral hood ("clitoridectomy") or excision of the clitoris with part or all of the labia minora ("excision"). *See, e.g.,* U.S. Department of State, Ethiopia: Report on Female Genital Mutilation (FGM) or Female Genital Cutting (FGC) (2001), http://www.state.gov/g/wi/rls/rep/crfgm.10098pf.htm.

### I.

In my view, the record compels the conclusion that the petitioners have a well-founded fear that their daughter Amen, now eight years old, will be subjected to FGM. The majority accepts the Immigration Judge (IJ)'s conclusion that Mengistu and Abebe would be able to prevent their daughter from being subjected to the procedure. The transcript of the hearing before the IJ, however, shows that neither Mengistu nor Abebe stated that they could prevent FGM from being performed. The IJ transformed the couple's expressions of disapproval of FGM, and their *desire* to protect their daughter from it, into affirmations of their *ability* to prevent it.

Mengistu stated, "[I]n Ethiopia like the female circumcision is like a very serious issue and almost practically all females have to undergo through that and I will try to do whatever I can to stop that but if I ... get imprisoned or I am unable to protect her she would have to go through that." When the IJ suggested that the parents controlled the FGM decision, Mengistu responded, "It's not as easy as that. I mean there will be pressure from the society, from the grandparents."

He added, "[I]f I'm for some reason incarcerated and I'm not there to—my wife will not be able to—I mean from the society and I would not alone be able to stop like family members who support that kind of tradition. She wouldn't be able to stop them, I'm afraid."

Abebe, who was herself circumcised as a baby, said nothing about her ability to prevent FGM from being performed, only that she did not want it to be done to her daughter and that she feared rejection if she resisted. The following dialogue transpired on direct examination:

Q. Do you believe in the practice of female circumcision?

A. No, I don't.

Q. Now, has this been done to your daughter?

A. No.

Q. If you were to go back to Ethiopia, if you have to go back, is this something that you want to have happen to your daughter?

A. No.

Q. Well, what do you think is going to happen to you if you go back and you were not willing to let this happen to your daughter?

A. I think I—I think I will be—I will be rejected by my family, my husband's family and my society too.

The questioning on the topic ended there. Thus, contrary to the IJ's finding, Abebe never stated that she would actually be able to protect Amen from FGM.

A well-founded fear of persecution does not require that it is "more likely than not" that persecution will occur. *INS v. Cardoza–Fonseca*, 480 U.S. 421, 449, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). As the Supreme Court noted, "One can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place." *Id.* at 431, 107 S.Ct. 1207. In fact, a "well-founded fear may be based on no more than a ten percent chance of actual persecution." *Cordon–Garcia v. INS*, 204 F.3d 985, 990 (9th Cir.2000) (citing *Velarde v. INS*, 140 F.3d 1305, 1310 (9th Cir.1998)). Thus, even if it is likely that Mengistu and Abebe will be able to protect Amen from FGM, they may still have a well-founded fear of not being able to do so.

The majority seems to require parents seeking asylum to testify that they would be absolutely powerless to prevent FGM from being performed on their daughters. But such a requirement would put parents of U.S. citizen girls, like Mengistu and Abebe, in the frightening position of risking court-ordered removal of their children in the event that their asylum claims are rejected. In *Olowo v. Ashcroft*, 368 F.3d 692 (7th Cir.2004), the Seventh Circuit denied asylum to Esther Olowo, the mother of two minor girls who would likely face FGM if returned to Nigeria. The mother testified that in Nigeria, her husband's family would force her daughters to undergo FGM, and that she would have no choice in the matter. *Id.* at 698. The Court refused to grant asylum to the mother because it held that she herself did not face persecution, *id.* at 701, and noted that the girls need not return to Nigeria because they had legal permanent resident

status in the United States. Olowo testified that she could not leave her daughters in the United States outside her care, and thus had no choice but to risk their exposure to FGM in Nigeria. *Id.* at 698, 702. The Seventh Circuit, blind to the Hobson's choice its own decision imposed, lambasted Olowo for seeking to take her daughters with her and ordered the notification of state agencies charged with protecting "minors from parents who allow acts of torture to be committed on minors." *Id.* at 703–04.

Given that a federal court might instigate the forcible separation of a mother from children she attempted to protect, asylum applicants in the position of Mengistu and Abebe face an anguishing dilemma. On the one hand, if they suggest that there is some chance they could prevent FGM, their asylum claims may be denied for absence of a well-founded fear (as in this case). They accordingly expose their daughters to some risk of FGM. On the other hand, if parents insist that the FGM decision is beyond their control, but their asylum claim is nevertheless denied (as in *Olowo*), they risk being stripped of custody of their daughters.

In light of this dilemma, and, more importantly, on the strength of the record before us, I would find the concerns expressed by Abebe and Mengistu on the threat of FGM sufficient to establish a well-founded fear of persecution.

## II.

The majority denies asylum based on its conclusion that the petitioners could protect their daughter from FGM. Because I disagree with this conclusion, I would reach the government's additional argument that, as a matter of law, parents may not derivatively claim asylum based on a fear that their U.S. citizen daughter would be forced to undergo FGM. The govern-

ment contends that because Mengistu and Abebe are not personally at risk of persecution, and because their daughter has a legal right to remain in the United States, there is no basis for relief. I would reject this argument as a misreading of the law and an affront to basic human values.

This Circuit has not addressed whether the parents of a daughter at risk of FGM may qualify for asylum. In *Azanor v. Ashcroft*, 364 F.3d 1013 (9th Cir.2004), a Nigerian woman petitioned to reopen deportation proceedings under the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (Torture Convention), contending that her U.S. citizen daughter would face FGM in Nigeria. We remanded to the BIA to consider whether an individual could assert a derivative torture claim on behalf of U.S. citizen children, which we noted presented an issue of first impression in the Ninth Circuit. *Id.* at 1021.

In *Abay v. Ashcroft*, 368 F.3d 634 (6th Cir.2004), the Sixth Circuit found that a mother who feared that her daughter would be forcibly subjected to FGM in Ethiopia qualified as a refugee. The Court noted that the Board of Immigration Appeals has on several occasions granted relief to the parents of girls who would face the threat of FGM in their home countries. *Id.* at 641–42 (citing several recent, non-precedential BIA decisions). In addition, *Abay* noted that in a case designated as having precedential value, the BIA found that a man seeking asylum based on the forced sterilization of his wife by the Chinese government qualified as a refugee. *Id.* at 641. (citing *In re C–Y–Z–*, 21 I. & N. Dec. 915 (BIA 1997)).

These decisions, the Court stated, "suggest a governing principle in favor of refugee status in cases where a parent and

protector is faced with exposing her child to the clear risk of being subjected against her will to a practice that is a form of physical torture causing grave and permanent harm." *Id.* at 642.

By contrast, the Seventh Circuit in *Oforji v. Ashcroft,* 354 F.3d 609 (7th Cir.2003), held that a parent may not establish a claim for asylum by pointing to a threat that her U.S. citizen child would face FGM in the event the parent were deported. In that case, the mother of two U.S. citizen girls claimed that if she returned to Nigeria, her daughters would be subjected to FGM because her tribe made refusal of the procedure punishable by death. *Id.* at 612. The Court held that U.S. regulations enforcing the U.N. Convention against Torture appear to foreclose a derivative claim, and found no legal basis for considering hardship to an asylum applicant's child. *Id.* at 615, 617–18. Recognizing that this position would require a deported mother to choose between leaving her children behind in the United States or exposing them to the threat of FGM, *id.* at 617–18, the Court nevertheless concluded that Congress "has opted to leave the choice with the illegal immigrant, not the courts." *Id.* at 618.

I do not believe that Congress intended any parent to face that choice. If Congress failed to clarify, in so many words, that a parent may claim asylum on the basis of a threat to her child, that omission is attributable only to a failure to imagine that so many young children would be independently targeted for persecution. Our consciousness of FGM has now grown, as has our knowledge that hundreds of thousands of children are compelled to serve as child soldiers in deadly conflicts around the world. *See, e.g.,* Human Rights Watch, Facts About Child Soldiers (2004), http://hrw.org/campaigns/crp/facts.htm. Surely, Congress did not intend

parents to choose between exposing their children to such threats and abandoning them halfway around the world.

Statements of the United Nations High Commissioner for Refugees ("UNHCR"), the U.N. agency charged with the international protection of refugees, support this view. In letters to the British Refugee Legal Centre, UNHCR opined that a woman could be considered a refugee if her daughters feared being compelled to undergo FGM. Heaven Crawley, Refugees and Gender: Law and Process 181 (2001). UNHCR's suggestion is relevant to our own asylum decisions because the U.S. definition of a refugee, codified in 8 U.S.C. § 1101(a)(42)(A), largely adopts the international definition interpreted by UNHCR: a refugee is one who, "owing to a well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion," is unable or unwilling to return to his or her country of origin. Convention Relating to the Status of Refugees, July 28, 1951, art. 1(A)(2), 189 U.N.T.S. 137, 152.

My conviction that our law grants refugee status to the parent of a child at risk of persecution is further strengthened by the great weight we attach to family unity. The Supreme Court has long protected, under substantive due process principles, the integrity of the family unit and the right of parents to raise their children. "The rights to conceive and to raise one's children have been deemed 'essential,' 'basic civil rights of man,' and 'rights far more precious ... than property rights.'" *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (finding an unmarried father constitutionally entitled to a parental fitness hearing before being deprived of custody of his children). "Our decisions establish that the Constitution protects the sanctity of the family precise-

ly because the institution of the family is deeply rooted in this Nation's history and tradition." *Moore v. City of East Cleveland,* 431 U.S. 494, 503, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (plurality opinion) (invalidating city ordinance that prevented a grandmother from living with her grandson).

In addition, U.S. immigration law prioritizes the value of keeping families together. Family reunification is the "dominant feature of current arrangements for permanent immigration to the United States," with special preferences for the immediate relatives of U.S. citizens. Thomas Alexander Aleinikoff et al., Immigration and Citizenship: Process and Policy 319 (4th ed.1998).

Furthermore, the Convention on the Rights of the Child, the most widely ratified human rights treaty in history,[1] requires states to "ensure that a child shall not be separated from his or her parents against their will, except when … such separation is necessary for the best interests of the child." Convention on the Rights of the Child, Nov. 20, 1989, art. 9, 28 I.L.M. 1448, 1460–61.

For all of these reasons, I would hold that Mengistu and Abebe qualify for asylum. Their daughter Amen is an eight-year-old American. I do not believe that Congress intended to jeopardize her welfare by forcing her parents to choose between risking her exposure to FGM and leaving her in the arms of strangers across many thousands of miles.

---

**1.** Only the United States and Somalia have not ratified the treaty, Somalia because it does not have an internationally recognized government. The United States has signed the treaty, signaling its intention to ratify, but has not yet ratified the agreement, which would include obtaining the approval of the U.S. Senate.