Bernardo Antonio GONZALEZ–HER-NANDEZ; Hilda Vivian Gonzalez; Heidi Argentina Gonzalez–Morales; Vilma Lissette Gonzalez–Morales; Mayra Alejandra Gonzaleza–Morales, Petitioners,

v.

John ASHCROFT, Attorney General, Respondent.

No. 02–7218.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 3, 2003.

Filed July 18, 2003.

**996**

Susan E. Hill, Los Angeles, CA, for the petitioners.

Norah Ascoli Schwarz, Jamie Dowd, U.S. Department of Justice, Civil Division, Office of Immigration Litigation, Washington, DC, for the respondent.

Before: THOMPSON, TROTT, and TALLMAN, Circuit Judges.

## OPINION

TALLMAN, Circuit Judge:

In this petition for review, we are once again asked to decide whether the Immigration and Naturalization Service (INS) rebutted the presumption of future persecution through the use of a State Department country report, thereby defeating the petitioners' claims of asylum. Because the country report in this case indicates that only high-level political figures are now subject to persecution on account of political opinion in Guatemala, and that in any event such leaders can safely relocate within Guatemala, we hold that substantial evidence supports the Board of Immigration Appeals' (BIA) decision to deny asylum to petitioners,[1] who were never party leaders nor high-level politicians. We therefore deny the petition.

### I

Bernardo Gonzalez–Hernandez (Gonzalez) and his family claim they are entitled to asylum because they have a well-founded fear that they will be persecuted on account of their political opinions if deported to their native country of Guatemala. The facts giving rise to their claim of asylum start in early 1987. For approximately three months of that year, Bernardo Gonzalez actively participated in the Christian Democratic Party.

At some point, the Christian Democratic Party elected or appointed Gonzalez to the "Board of Judges," a position requiring him to monitor an election for voter fraud. This was Gonzalez's only official position in the Christian Democratic Party, and it lasted for just the day of the election. Gonzalez does not recall the exact day, but remembers that it was in either February or March of 1987.

On election day, Gonzalez watched members of the rival Revolutionary Party (PR)

---

**1.** The claim of entitlement to asylum is based upon the activities of the family patriarch, Bernardo Antonio Gonzalez–Hernandez. The remaining members of his family, his wife and three children, claim refugee status derivatively if asylum is granted to Bernardo Gonzalez.

stuff ballots. Gonzalez confronted the PR members, as he was required to do. The PR members responded by striking Gonzalez in the head with the butt of a gun. The police were present while this happened and failed to intervene.

Gonzalez received the first of two threatening letters one week after this incident. The letter stated that Gonzalez and his family were "going to have very many problems" and that Gonzalez "would have to pay ... very dearly." The second note, delivered to Gonzalez a few days later, reiterated that Gonzalez and his family were in serious danger.

Though no more threatening letters arrived at his house, Gonzalez repeatedly heard rumors that the PR wanted to harm both him and his family. In November 1987 the Gonzalez family moved to Guatemala City for safety. The family resided in Guatemala City for approximately seven months without receiving any more threats or letters. However, friends and family back home informed Gonzalez that PR members were inquiring about his whereabouts.

In July 1988 Gonzalez entered the United States without inspection. Five months later, Gonzalez returned to Guatemala and assisted his family in entering the United States without inspection. The Gonzalez family has lived here since December 1988.[2]

In April 1998 the INS initiated removal proceedings, charging that Gonzalez and his family illegally resided in the United States because none of the family members were lawfully admitted or paroled. A hearing was held before an Immigration Judge, and the Gonzalez family members conceded that they were subject to removal but argued that they were eligible for asylum and withholding of removal. The Immigration Judge determined that the family members did not qualify for asylum or withholding of removal. The BIA subsequently dismissed their appeal.

The family members now petition for review.

· II ·

The Attorney General, at his discretion, is authorized to grant asylum to "refugees." 8 U.S.C. § 1158(b)(1). A refugee is a person unable to return to his or her country of nationality because that person will be persecuted upon return, or because that person has a well-founded fear of persecution, "on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42).

■ If the applicant for asylum has suffered past persecution, he or she "is presumed to have a well-founded fear of future persecution." *Rios v. Ashcroft,* 287 F.3d 895, 900 (9th Cir.2002). "The INS can rebut this presumption by showing, by a preponderance of the evidence, that the conditions in the applicant's home country have changed such that[he or] she no longer has a well-founded fear of persecution." *Id.*; 8 C.F.R. § 208.13(b)(1)(i). Evidence presented by the INS to rebut the presumption must be tailored to the applicant: "Information about general changes in the country is not sufficient." *Rios,* 287 F.3d at 901 (quoting *Garrovillas v. INS,* 156 F.3d 1010, 1017 (9th Cir.1998)); *see also id.* ("The INS is obligated to introduce evidence that, on an individualized basis,

---

**2.** In their time in the United States, the Gonzalez family members have heard one rumor relating to the PR. In 1997 or early 1998, Gonzalez's sister, who continues to live in Gonzalez's hometown, learned through hearsay that the PR still wanted to know the whereabouts of her brother.

rebuts a particular applicant's specific grounds for his well-founded fear of future persecution.") (internal quotation marks and citation omitted).

### A

The Immigration Judge ruled that Bernardo Gonzalez[3] "failed to submit sufficient specific facts as well as concrete and/or credible evidence from which the Court might infer that [he had] been persecuted in Guatemala" and therefore denied asylum. The Immigration Judge also held that Gonzalez would not be entitled to relief even if he had suffered past persecution because country conditions in Guatemala have changed such that Gonzalez no longer has a well-founded fear of persecution in that country.

The BIA disagreed with the Immigration Judge's conclusion regarding past persecution. It held that Gonzalez "demonstrated that he suffered past persecution on account of his political opinion." Nevertheless, the BIA dismissed the appeal on the ground that a 1997 State Department country report, introduced into evidence by the INS, demonstrates that Gonzalez no longer has a well-founded fear of persecution in Guatemala. According to the BIA, this country report rebuts the presumption that Gonzalez will be persecuted upon his return to Guatemala in three ways. First, the report indicates that peace accords were signed in Guatemala, "ending the civil war in that country." Second, the report states that "only party leaders or high-profile activists generally would be vulnerable to such harassment and usually only in their home communities, making internal relocation a viable alternative in many cases." Finally, the report never mentions the PR, suggesting "that the political party [Gonzalez] opposed and feared may no longer even exist." In addition to the country report, the BIA also relied upon the lapse of time between the events giving rise to the past persecution and the hearing (ten years) to hold that Gonzalez no longer has a well-founded fear of persecution in Guatemala.

### B

■ Our review of the BIA's determination that Gonzalez does not qualify for asylum is quite narrow. The BIA's decision need only be supported by substantial evidence. *Kumar v. INS*, 204 F.3d 931, 933 (9th Cir.2000). In other words, to overturn the BIA's determination that he is ineligible for asylum, Gonzalez "must show that the evidence he presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *INS v. Elias–Zacarias*, 502 U.S. 478, 483–84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992); *see also* 8 U.S.C. § 1252(b)(4)(B). "Within broad limits the law entrusts the agency to make the basic asylum eligibility decision...." *INS v. Ventura*, 537 U.S. 12, 16, 123 S.Ct. 353, 355, 154 L.Ed.2d 272 (2002) (per curiam).

■ The BIA did not exceed those limits in holding that the INS rebutted the presumption that Gonzalez has a well-founded fear of future persecution. The 1997 country report introduced into evidence by the INS, "Guatemala—Profile of Asylum Claims & Country Conditions," states that "only party leaders or high-profile activists generally would be vulnerable to" persecution based on political opinion. Gonzalez was neither a party leader nor a high-profile activist. By his own admission, Gonzalez's involvement in

---

**3.** For simplicity, we refer only to Mr. Gonzalez, though his immediate family members also petition for review.

the Christian Democratic Party was minimal: he participated in the Party for three months and monitored one election.

■ Even if we assume that Gonzalez was in fact a "party leader" or "high profile activist," the 1997 country report explains that such persons are usually susceptible to persecution "only in their home communities, making internal relocation a viable alternative in many cases." Because "an individual who can relocate safely within his home country ordinarily cannot qualify for asylum here," *Ventura*, 123 S.Ct. at 356 (citing 8 C.F.R. § 208.13(b)(1)(i)), the fact that Gonzalez relocated to Guatemala City for several months without receiving any threats or letters is highly relevant. The BIA could have reasonably concluded that Gonzalez would be safe in Guatemala City, although Gonzalez might face persecution if he returned to his hometown. Substantial evidence therefore supports the BIA's asylum determination.

### C

To be sure, the country report is somewhat ambiguous and contradictory.[4] For example, the report never mentions the PR party. The report also notes that "political violence during 1996 remained high," that "after the March cease-fire, guerrillas continued to employ death threats," and that "local political rivalries can result in threats and violence." That the country report is somewhat contradictory or ambiguous, however, does not render it useless to the changed country conditions inquiry. The Supreme Court made clear in *INS v. Ventura* that when such a country report is at issue, it is entirely appropriate for the BIA to "bring its expertise to bear upon the matter," 123 S.Ct. at 355, and decide which portions of the report are relevant to the applicant.

*Ventura* concerned an alien from Guatemala who, like Gonzalez, claimed entitlement to asylum. The BIA determined that Ventura was ineligible for asylum. *Id.* at 354. Because of this determination, the BIA did not consider the government's alternative argument that conditions in Guatemala had improved such that Ventura no longer had a fear of persecution in that country. On petition for review to this court, we reversed the BIA's asylum determination and held that Ventura had been persecuted in the past. 264 F.3d 1150 (9th Cir.2001).

Significant here, we declined to remand the "changed country conditions" issue to the BIA for it to decide in the first instance. We considered the record evidence concerning changed country conditions— *the same 1997 State Department country report about Guatemala at issue in the present petition*—and concluded that the report "clearly demonstrates that the presumption of a well-founded fear of future persecution was *not* rebutted." *Id.* at 1157. (emphasis added).

The Supreme Court summarily reversed our decision not to remand and held that a court of appeals may not determine in the

---

**4.** In instances where the evidence of changed country conditions comes in the form of an ambiguous or general country report, we have granted several petitions for review. Indeed, three recent decisions of this circuit hold that the INS failed to rebut the presumption that a petitioner has a well-founded fear of future persecution in Guatemala by introducing a country report about Guatemala. *See Ruano v. Ashcroft*, 301 F.3d 1155, 1161–

62 (9th Cir.2002); *Rios*, 287 F.3d at 902; *Chanchavac v. INS*, 207 F.3d 584, 592 (9th Cir.2000). We need not distinguish these cases, however, to hold that the BIA's determination in this petition was supported by substantial evidence. Instead, we follow the guidance of the Supreme Court's more recently decided *Ventura* case, 537 U.S. 12, 123 S.Ct. 353, 154 L.Ed.2d 272, which concerned, in part, the same country report at issue here.

first instance, whether country conditions have changed such that a presumption of persecution is or is not rebutted. *Ventura,* 123 S.Ct. at 356. The Court explained that our decision not to remand was error because appellate courts must not "intrude upon the domain which Congress has exclusively entrusted to an administrative agency." *Id.* at 355 (quoting *SEC v. Chenery Corp.,* 318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626 (1943)). "[P]olitical change in Guatemala," the Court reasoned, is "a highly complex and sensitive matter" upon which the BIA must "bring its expertise to bear." *Id.* at 355–56.

The Court further explained that our conclusion regarding the State Department country report—that it "clearly demonstrates that the presumption of a well-founded fear of future persecution was *not* rebutted"—was "legally inadequate":

> [T]he State Department report is, at most, ambiguous about the matter [of changed country circumstances]. The bulk of the report makes clear that considerable change has occurred. The report says, for example, that in December 1996 the Guatemalan Government and the guerrillas signed a peace agreement, that in March 1996 there was a cease fire, that the guerrillas then disbanded as a fighting force, that "the guerrillas renounced the use of force to achieve political goals," and that "there was [a] marked improvement in the overall human rights situation."
>
> As the Court of Appeals stressed, two parts of the report can be read to the contrary. They say that (1) even "after the March cease-fire, guerrillas continued to employ death threats" and (2) "the level of crime and violence now seems to be higher than in the recent past." Yet the report itself qualifies these statements. As to the second, the report (as the Court of Appeals noted)

> says: "*Although* the level of crime and violence now seems to be higher than in the recent past, *the underlying motivation in most asylum cases now appears to stem from common crime and/or personal vengeance,*" i.e., not politics. And the report (in sections to which the Court of Appeals did not refer) adds that in the context of claims based on political opinion, in "our experience, only party leaders or high-profile activists generally would be vulnerable to such harassment and usually only in their home communities." This latter phrase "only in their home communities" is particularly important in light of the fact that an individual who can relocate safely within his home country ordinarily cannot qualify for asylum here. See 8 CFR § 208.13(b)(1)(i).

*Id.* at 356. (some citations omitted) (emphasis in original). In other words, the Court reasoned that if the matter had been remanded to the BIA, the BIA could have rationally and properly held that this country report rebutted Ventura's presumption of future persecution—even though the report is somewhat ambiguous and contradictory.

■■ The point is that the agency, not a court of appeals, must construe the country report and determine if country conditions have changed such that the applicant no longer has a well-founded fear of persecution. This does not mean, of course, that an applicant lacks judicial review of the BIA's determination. But where the BIA rationally construes an ambiguous or somewhat contradictory country report and provides an "individualized analysis of how changed conditions will affect the specific petitioner's situation," *Borja v. INS,* 175 F.3d 732, 738 (9th Cir.1999) (en banc) (citation and internal quotation marks omitted), substantial evidence will support the agency determination. That is what

happened here. The petition for review must be denied.[5]

**PETITION DENIED.**

5. Because we hold that Gonzalez and his family do not have a well-founded fear of persecution, it necessarily follows that they do not qualify for withholding of removal. *See Ghaly v. INS*, 58 F.3d 1425, 1429 (9th Cir.1995).