**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| JAGTAR SINGH,<br>*Petitioner*,<br><br>v.<br><br>ERIC H. HOLDER, JR., Attorney<br>General,<br>*Respondent*. | No. 10-71999<br><br>Agency No.<br>A077-843-923<br><br><br>OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Submitted January 16, 2014\*
San Francisco, California

Filed May 21, 2014

Before: J. Clifford Wallace and Jay S. Bybee, Circuit
Judges, and Robert W. Gettleman, Senior District Judge.\*\*

Opinion by Judge Bybee;
Dissent by Judge Gettleman

---

\* The panel unanimously concludes this case is suitable for decision
without oral argument. *See* Fed. R. App. P. 34(a)(2).

\*\* The Honorable Robert W. Gettleman, Senior District Judge for the
U.S. District Court for the Northern District of Illinois, sitting by
designation.

## SUMMARY[***]

### Immigration

The panel denied a petition for review of the Board of Immigration Appeals' denial of withholding of removal.

The panel held that substantial evidence supported the Board's determination that the government had carried its burden to show by a preponderance of the evidence that there had been a fundamental change in circumstances with respect to the treatment of Sikhs and supporters of Khalistan in India so as to overcome the presumption that petitioner would be persecuted if he were removed. The panel explained that the agency properly conducted an individualized analysis of the changed country conditions as they related to petitioner's claims. The panel further explained that the agency is permitted to consider the relative probative value of hearsay and non-hearsay evidence, and in this case, the agency appropriately weighed the country reports against petitioner's testimony and the affidavits submitted by family members and a village sarpanch stating that Indian police continue to search for him.

Dissenting, District Judge Gettleman would grant the petition because the agency failed to conduct an individualized analysis of changed conditions, specifically as they relate to an individual such as petitioner who was persecuted by police in the past; the agency incorrectly shifted the burden of proof to petitioner rather than the

---

[***] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

government; and substantial evidence did not support the finding of changed country conditions.

## COUNSEL

Inna Lipkin (argued), Law Office of Inna Lipkin, Redwood City, California, for Petitioner.

Tony West, Assistant Attorney General, Douglas E. Ginsburg, Assistant Director, Katherine A. Smith (argued), Trial Attorney, Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C., for Respondent.

## OPINION

BYBEE, Circuit Judge:

Jagtar Singh, a native and citizen of India, petitions for review of a Board of Immigration Appeals (BIA) order concluding that he is ineligible for withholding of removal. The sole question before us is whether substantial evidence supports the BIA's determination that the government showed that there has been a fundamental change in circumstances such that Singh's life or freedom will not be threatened on account of his race, religion, nationality, membership in a particular social group, or political opinion if he is removed to India. Because substantial evidence supports the BIA's decision, we deny the petition for review.

I

We begin by reciting the facts offered by Singh during his testimony before the Immigration Judge (IJ) and in his supporting declarations. Although the IJ determined that Singh's testimony was not credible, the Board did not expressly adopt that finding in its order dismissing Singh's appeal. "When the BIA's decision is silent on the issue of credibility, despite an IJ's explicit adverse credibility finding, we may presume that the BIA found the petitioner to be credible." *Krotova v. Gonzales*, 416 F.3d 1080, 1084 (9th Cir. 2005) (citations omitted). Accordingly, we refrain from adopting the IJ's adverse credibility finding.

On August 18, 1999, Singh entered the United States without inspection. The Immigration and Naturalization Service (INS) served him with a notice to appear. Singh conceded that he was subject to removal and applied for asylum, withholding of removal, and relief under the Convention Against Torture (CAT). The IJ held a merits hearing on September 9, 2003.

Singh is a Sikh who was born in India's Punjab province. In March 1993, he joined the Akali Dal (Mann) political party, which supported the creation of an independent state for Sikhs in India called Khalistan. Singh owned trucks that he used to transport party members to rallies and to carry pro-Khalistan political posters.

On May 4, 1994, police stopped Singh while he was driving home from a political meeting with two other party members. Police transported Singh to the station and detained him for four days because he was carrying pro-Khalistan posters in his truck. They questioned Singh about

which terrorists he was meeting with and beat him with leather belts, wooden sticks, and a rifle butt. He was not released until his family, with the help of his village sarpanch, bribed the police.

On November 2, 1995, police detained Singh as he was returning from a political rally. They removed a banner from his truck that advertised the political rally and took him to the station. There, they detained Singh for ten days and beat him with sticks and straps. Once again they questioned Singh about aiding militants and terrorists. And once again police released Singh only after his family and village sarpanch paid a bribe.

On June 7, 1997, police arrested Singh for a third time. A bomb blast had occurred in the city where Singh was working, and police detained him at a checkpoint because he is a Sikh. Police questioned him about the blast for five days before transferring him to another station where he was beaten severely. After Singh fell unconscious from the beating, police delivered him to the hospital. He was released when a friend bribed the officer who was keeping watch. Singh fled the area and eventually entered the U.S. without inspection. In the meantime, Indian police continued to question and harass his wife, father, uncle, and cousin.

The IJ denied Singh's application for asylum on the basis that it was time barred. The IJ further found that Singh's testimony was not credible or corroborated. And he concluded that Singh was arrested for allegedly violating laws of general applicability rather than persecuted on account of a protected ground. The IJ therefore denied Singh's request for withholding of removal and protection under the CAT.

The BIA entered an order affirming the IJ's decision to deny all three forms of relief.

In an unpublished memorandum disposition, we granted in part Singh's petition for review. *Singh v. Keisler*, 249 F. App'x 602, 603 (9th Cir. 2007). We held that we lacked jurisdiction to review the determination that Singh's asylum application was time barred. *Id.* at 602. And we agreed with the IJ and the BIA that Singh was not entitled to relief under the CAT. *Id.* at 603. With respect to Singh's request for withholding of removal, we declined to adopt the IJ's adverse credibility finding because the BIA had not done so. *Id.* at 602. We then held that substantial evidence did not support the determination that Singh's second and third arrests were not motivated by a protected ground. *Id.* at 603. We therefore concluded that Singh had suffered past persecution, which gives rise to a presumption that he is eligible for withholding of removal. *Id.*

We remanded the case to the BIA, *id.*, which in turn remanded to the IJ for further findings concerning Singh's eligibility for withholding of removal. The IJ held a hearing on July 21, 2008. Singh testified that his wife and father had told him that police continued to visit their homes to inquire about his whereabouts. They demanded to know his contact information in the U.S. and left only after his father bribed them. He also submitted declarations from his wife, father, and village sarpanch stating that Indian police were still looking for him. The government responded by pointing out inconsistencies in Singh's testimony and introducing documents indicating that conditions in India had changed for Sikhs who were members or supporters of groups like Akali Dal (Mann).

On September 2, 2008, the IJ issued an order denying Singh's application for withholding of removal. The IJ acknowledged that, pursuant to this court's memorandum disposition, Singh had established that he suffered past persecution on account of a protected ground and that he was therefore entitled to a presumption that he would be persecuted if returned to India. *See* 8 C.F.R. § 1208.16(b)(1)(i). The IJ nevertheless concluded that the government had carried its burden to show by a preponderance of the evidence that there had been a fundamental change in circumstances so as to overcome the presumption that Singh would be persecuted if he were removed. *See id.* § 1208.16(b)(1)(i)(A). The IJ declared that Singh's testimony that police continued to harass his family and search for him was not credible. He also analyzed the country reports and other documents submitted by both parties and concluded that there was no evidence that similarly situated individuals were being persecuted in India.

On May 26, 2010, the BIA dismissed Singh's appeal. The Board did not adopt the IJ's adverse credibility determination. Instead, the BIA agreed with the IJ's assessment that "[t]he country information submitted by the Department of Homeland Security (DHS) reflects that conditions in India have greatly improved." The Board quoted country reports from the U.S. Department of State and the U.K. Home Office to this effect. And it explained that "the Immigration Judge properly analyzed how changed country conditions affected [Singh's] specific situation and was sufficiently individualized to provide substantial evidence for the conclusion that [Singh] failed to establish eligibility for relief."

II

"We review petitions for review of the BIA's determination that a petitioner does not qualify for asylum or withholding of removal under the highly deferential 'substantial evidence' standard." *Zetino v. Holder*, 622 F.3d 1007, 1012 (9th Cir. 2010) (citing *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)). "Where the BIA issues its own decision but relies in part on the immigration judge's reasoning, we review both decisions." *Flores-Lopez v. Holder*, 685 F.3d 857, 861 (9th Cir. 2012).

III

Because we previously determined that Singh had endured past persecution, *Singh*, 249 F. App'x at 603, he is entitled to a presumption that his life or freedom would be threatened in the future if he is removed to India, 8 C.F.R. § 1208.16(b)(1)(i). That presumption is rebutted if the government shows by a preponderance of the evidence that there has been a fundamental change in circumstances such that Singh's life or freedom would not be threatened on account of a protected ground upon his return to India. *Id.* § 1208.16(b)(1)(i)(A).

The IJ and the BIA concluded that there had been a fundamental change in circumstances after interpreting and applying the country condition evidence submitted by the parties. Both the IJ and the BIA cited the State Department's 2008 issue paper on the treatment of Sikhs in India, which explains that "[t]oday, conditions for Indian Sikhs differ dramatically from those of the 1980s and 1990s. Sikhs have ascended to the highest level of the Indian government." *See Kumar v. INS*, 204 F.3d 931, 934 (9th Cir. 2000) (reasoning

that conditions had fundamentally changed where, *inter alia*, the petitioner's political party had participated in elections). The issue paper acknowledges that "[h]uman rights abuses, including, torture, arbitrary arrest, and custodial rape, are still committed by police throughout India. While conditions have improved since 1995 and progress has been rapid in the past 10 years, police impunity for committing human rights abuses remains a legitimate threat to all Indians." But the paper concludes that "[t]here is no indication that Sikhs are singled out for such abuse or that such abuse occurs with either the overt or tacit consent of the Government of India." *See* 8 U.S.C. § 1231(b)(3) (stating that an alien is eligible for withholding of removal "if the Attorney General decides that the alien's life or freedom would be threatened in that country *because of the alien's race, religion, nationality, membership in a particular social group, or political opinion*." (emphasis added)). The issue paper further notes that "[a]ny current persecution of Sikhs based on political or religious beliefs would be widely covered by India's vibrant and open media," which lends a degree of confidence to the State Department's assessment that individuals like Singh are not being persecuted on account of a protected ground.

The government also introduced the State Department's 2007 country report on human rights practices in India. The thirty-four page report is devoid of any mention of recent or ongoing persecution of Sikhs, even though it extensively catalogs threats to human rights encountered by various political, religious, and ethnic groups in India. *See Sowe v. Mukasey*, 538 F.3d 1281, 1285 (9th Cir. 2008) ("U.S. Department of State country reports are the most appropriate and perhaps the best resource for information on political situations in foreign nations." (internal quotation marks and citation omitted)); *Molina-Estrada v. INS*, 293 F.3d 1089,

1096 (9th Cir. 2002) ("Even in the face of a presumption of future persecution, a State Department report is relevant."). The country report states that the Indian government continued to investigate reports of murder and illegal cremation during the 1980s and early 1990s in Punjab, and that a commission recommended compensating the family members of individuals who were killed by Indian police during that period. In 2005, India's prime minister apologized to the Sikh community for atrocities committed in the 1980s and 1990s, two party officials resigned after being indicted for their role in the violence, and charges were reportedly filed against dozens of police officials. *See Sowe*, 538 F.3d at 1286 (explaining that conditions had fundamentally changed where, *inter alia*, the perpetrators of the past persecution were being held accountable by the government).

The reports acknowledge, however, that the government made "little progress" in holding hundreds of other police officers accountable for causing the death and disappearance of Sikhs in the 1980s and 1990s. India's slow and uneven progress in prosecuting those responsible for past persecution is troubling. But it does not mean that the Board's decision is not supported by substantial evidence. We have repeatedly recognized that the IJ and the BIA are entitled to rely on country reports that contain mixed messages, ambiguities, or inconsistencies. *See Gonzalez-Hernandez v. Ashcroft*, 336 F.3d 995, 999 (9th Cir. 2003) ("That the country report is somewhat contradictory or ambiguous [ ] does not render it useless to the changed country conditions inquiry. . . . [W]hen such a country report is at issue, it is entirely appropriate for the BIA to 'bring its expertise to bear upon the matter[]' . . . and decide which portions of the report are relevant to the applicant." (quoting *INS v. Ventura*, 537 US

12, 17 (2002)); *see also Go v. Holder*, 640 F.3d 1047, 1054 (9th Cir. 2011) ("[The petitioner] correctly points out that the country reports describe several instances of abuse and corruption within the [ ] criminal justice system. Nevertheless, other information contained in these reports supports the Board's conclusion that torture is unlikely."); *Sowe*, 538 F.3d at 1286 ("We are not in a position to second-guess the IJ's construction of the somewhat contradictory [ ] country report."). We would be overstepping our bounds if we reviewed the country reports *de novo* rather than affording the agency's interpretation of the evidence its due deference. *See Gonzalez-Hernandez*, 336 F.3d at 1000 ("[T]he agency, not a court of appeals, must construe the country report and determine if country conditions have changed such that the applicant no longer has a well-founded fear of persecution. . . . [W]here the BIA rationally construes an ambiguous or somewhat contradictory country report and provides an individualized analysis of how changed conditions will affect the specific petitioner's situation, substantial evidence will support the agency determination." (internal quotation marks and citation omitted)); *Marcu v. INS*, 147 F.3d 1078, 1082 (9th Cir. 1998) ("[T]here is a factual dispute regarding the current conditions in [the petitioner's country of origin]. We do not solve this dispute. Our task is to determine whether there is substantial evidence to support the BIA's finding, not to substitute an analysis of which side in the factual dispute we find more persuasive.").

The evidence introduced by the government is sufficiently individualized to address Singh's claim that he will be persecuted because of his past involvement with the Akali Dal (Mann) party. *See Popova v. INS*, 273 F.3d 1251, 1259 (9th Cir. 2001) ("The [government] is obligated to introduce evidence that, on an individualized basis, rebuts a particular

applicant's specific grounds for his well-founded fear of future persecution. Information about general changes in the country is not sufficient." (internal quotation marks and citations omitted)). The government submitted a 2003 report by the Citizenship and Immigration Service (CIS), which observes that "[t]here is little recent evidence suggesting that members or supporters of the Akali Dal (Mann) party in Punjab are being systematically targeted for arrest or other forms of mistreatment by police. . . . [A]ny police abuse of Akali Dal (Mann) supporters would likely get press attention." Furthermore, a human rights lawyer who is "active in Punjab human rights issues" reported in 2002 "that he was not aware of any recent arrests or incidents of harassment of Sikhs solely on account of their political views." And "[a]dding to the notion that Sikhs are no longer targeted simply for holding pro-Khalistani views, two recent nongovernmental reports concluded that while torture is still a serious problem in Punjab, police generally no longer torture Sikhs on account of political views or suspected militant links. Amnesty International said in a January 2003 report that currently 'the majority of victims are detainees held in connection with criminal investigations, and include members of all religious communities and social groups.'" Another 2003 report from the CIS notes that "several experts have suggested that only those considered by police to be high-profile militants are at risk. . . . Punjab police normally do not consider a person to be a high-profile militant . . . simply for having strong political views or being politically active." The evidence offered by the government thus expressly addresses the plight of individuals who, like Singh, were active supporters of Akali Dal (Mann) and related pro-Khalistani causes.

The CIS reports, like the State Department's country report, contain some ambiguous and inconsistent language. For example, one expert "speculated that it is possible that Punjab police at times arrest Akali Dal (Mann) supporters because they suspect them of being linked to secret factions within the Akali Dal . . . [that] essentially operate as terrorist cells." Another expert opined that "Punjabi Sikhs are likely targeted at times by local officials for holding pro-Khalistani views" by "rogue officers at the local level, perhaps for personal reasons" even though "this is not done systematically." The expert added that it "seemed plausible" that "this harassment could include detention and physical abuse" though "she had no recent evidence of such treatment being meted out." As we have already noted, it is well established that a decision is supported by substantial evidence despite the presence of conflicting or ambiguous information in the country reports. *See Gonzalez-Hernandez*, 336 F.3d at 999; *see also Go*, 640 F.3d at 1054; *Sowe*, 538 F.3d at 1286.

This is not a case where the record contained only limited information about the circumstances faced by the petitioner or consisted solely of unreliable or uncorroborated reports. *See, e.g.*, *Smolniakova v. Gonzales*, 422 F.3d 1037, 1052 (9th Cir. 2005) (observing that the government's country condition submissions were limited to two newspaper articles, which are not authoritative evidence of country conditions); *Mousa v. Mukasey*, 530 F.3d 1025, 1030 (9th Cir. 2008) (noting that the government relied on a single newspaper article as evidence of changed country conditions). In addition to the evidence already discussed, both the BIA and the IJ cited a 2007 operational guidance note from the U.K. Home Office, which echoes the U.S. State Department's views in concluding that "[i]t is [ ] unlikely that individuals

associated at a low or medium level with Sikh militant groups would be able to establish a well-founded fear of persecution." The government's submissions also included a 2008 country report from the U.K. and a 2000 report from Denmark. The IJ weighed the government's documents alongside Singh's country condition evidence, which consisted of reports from Amnesty International and Human Rights Watch. Like the State Department's 2008 issue paper, these reports note that many of the police officers responsible for the atrocities committed against Sikhs in the 1980s and early 1990s have not been brought to justice. But the reports make no mention of either ongoing persecution of Sikhs or any risk of renewed persecution of individuals because they are Sikh, members of Akali Dal (Mann), or supporters of related pro-Khalistani causes.

The scope and precision of the country report evidence in the record distinguishes this case from the cases where we have deemed such evidence insufficient to support a determination that there has been a fundamental change in circumstances. *See, e.g.*, *Mutuku v. Holder*, 600 F.3d 1210, 1213–14 (9th Cir. 2010) (explaining that the lone country report offered by the government stated that political activists like the petitioner were still "routinely" persecuted and that "[n]othing" in the report indicated that conditions had changed for individuals like the petitioner); *Ahmed v. Keisler*, 504 F.3d 1183, 1197–98 (9th Cir. 2007) (observing that the country report contained "numerous references" to persecution of similarly situated individuals and that the government had not offered evidence that conditions in the area where petitioner lived had improved).

The dissent relies on our unpublished memorandum disposition in *(Kapur) Singh v. Holder*, 372 F. App'x 821

(9th Cir. 2010), to argue that the country reports are not sufficiently individualized. The decision lacks precedential value. *See* 9th Cir. R. 36-3(a) ("Unpublished dispositions and orders of this Court are not precedent."). To the extent that an unpublished memorandum disposition ought to inform our decision, we note that there are a number of memoranda that are consistent with our conclusion in this case. *See, e.g.*, *(Achhar) Singh v. Holder*, 550 F. App'x 487, 488 (9th Cir. 2013) ("[A] Citizenship and Immigration Services report indicates that only a small number of high-profile Sikhs who have been implicated in political militancy remain at risk in India. . . . Although the record also contains some evidence of continuing harassment of Sikhs due to their suspected or actual pro-Khalistani views, there is ample evidence supporting the IJ's decision, and '[w]e are not in a position to second-guess the IJ's construction of [a] somewhat contradictory . . . country report.'" (alterations and omission in original) (quoting *Sowe*, 538 F.3d at 1286)); *(Harpal) Singh v. Holder*, 399 F. App'x 310, 311 (9th Cir. 2010); *(Joginder) Singh v. Holder*, 391 F. App'x 666, 667 (9th Cir. 2010) ("The country condition reports indicate that persecution in the Punjab region on account of Akali Dal Mann membership essentially ended as of the mid-1990s."); *Vaid v. Mukasey*, 288 F. App'x 321, 324 (9th Cir. 2008).

In addition to requiring sufficiently *individualized evidence* of changed circumstances in the petitioner's country of origin, *see, e.g.*, *Popova*, 273 F.3d at 1259, we have also required the agency to "make an *individualized determination*" of the petitioner's claim for relief by "assessing the impact of changed country conditions on an individualized basis," *Lopez v. Ashcroft*, 366 F.3d 799, 806 (9th Cir. 2004) (emphasis added). In other words, we have not credited overbroad and conclusory statements that fail to

reference relevant evidence. *See, e.g.*, *Gui v. INS*, 280 F.3d 1217, 1229 (9th Cir. 2002) (holding that an unsupported one-sentence statement that country conditions had changed "did not represent the kind of individualized analysis this court has required").

Here, both the IJ and the BIA expressly applied the record evidence to Singh's own individual circumstances. As noted, the orders cited the relevant portions of the issue papers published by the U.S. State Department and the U.K. Home Office. The excerpts quoted by the agency stated that it was unlikely that an individual would be persecuted either because he is a Sikh or because he is a member or supporter of political groups like Akali Dal (Mann). For example, the IJ noted that the U.K. operational guidance note "states that even actual members of militant separatist groups are not likely to be able to establish persecution." He then applied this evidence to Singh's particular circumstances, explaining that "[t]he most [Singh] claims is that police suspected him of aiding members a decade ago. But if the members themselves are not subject to persecution, it makes no sense to believe that mere sympathizers are at risk of persecution." The IJ once again revealed that he had considered the specific grounds for possible persecution raised by Singh when he concluded that "it is clear from the foregoing [evidence] that [Singh's] mere membership in the Akali Dal Mann Party provides no basis, in today's India, for a finding that he will be persecuted."

In short, the agency identified the particular grounds on which Singh claimed he might be persecuted and cited specific relevant evidence showing that persecution on those grounds is unlikely. That is the very definition of the individualized determination that our case law requires. *See*

*Chand v. INS*, 222 F.3d 1066, 1079 (9th Cir. 2000) ("[T]he determination of whether or not a particular applicant's fear is rebutted by general country conditions information requires an individualized analysis that focuses on the specific harm suffered and the relationship to it of the particular information contained in the relevant country reports.").

The agency's application of the country condition evidence to Singh's testimony distinguishes this case from the cases where we have held that the analysis is not sufficiently individualized. *See, e.g.*, *Ali v. Ashcroft*, 394 F.3d 780, 788 (9th Cir. 2005) ("The only information specific to [the petitioner] that the IJ cites is that there is no evidence of 'genocide or imprisonment' of members of her clan. The IJ fails to discuss both the persecution that [the petitioner] experienced on account of her political opinion, and whether the circumstances have changed such that she no longer needs to fear retaliation."); *Garrovillas v. INS*, 156 F.3d 1010, 1017 (9th Cir. 1998) ("The BIA did quote two paragraphs of a State Department report finding generally improved conditions in the [petitioner's country of origin], but did not discuss its applicability to [the petitioner]. Thus, it is not clear whether this quotation was intended to serve as a means of rebutting the presumption of a well-founded fear of future persecution.").

Furthermore, the IJ appropriately weighed the country reports against Singh's testimony and the affidavits submitted by Singh's wife, father, and village sarpanch stating that Indian police continue to search for him. As noted, we decline to adopt the IJ's adverse credibility determination because the BIA did not expressly do so. But "[t]he general principle requiring the factfinder and a court of appeals to accept a petitioner's factual contentions as true in the absence

of an adverse credibility finding does not prevent us from considering the relative probative value of hearsay and non-hearsay testimony." *Gu v. Gonzales*, 454 F.3d 1014, 1021 (9th Cir. 2006). The IJ observed that Singh's wife, father, and village sarpanch "have not been questioned to determine the validity and accuracy of the statements, and this is especially problematic in light of the fact that the claims in the affidavits are completely at variance with the country condition evidence." For this reason, the IJ concluded that "the affidavits are entitled to very little weight." This determination, like the rest of the agency's findings, is consistent with our case law. *See id.* ("[W]here an asylum applicant's testimony consists of hearsay evidence, the statements by the out-of-court declarant may be accorded less weight by the trier of fact when weighed against non-hearsay evidence."); *Sharma v. Holder*, 633 F.3d 865, 870–71 (9th Cir. 2011) ("The police, according to [the petitioner's] hearsay recounting of what his father told him, did continue to threaten [the petitioner] after he came to the United States. But, because it is hearsay, the immigration tribunals were permitted to give this evidence less weight than the other evidence in the record."). By contrast, the IJ reasoned that the country reports were "entitled to more weight by virtue of their objectivity and the fact that they are public, official documents, drafted to provide guidance to government officials." *See Sowe*, 538 F.3d at 1285 ("U.S. Department of State country reports are the most appropriate and perhaps the best resource for information on political situations in foreign nations." (internal quotation marks and citation omitted)).

The crux of our disagreement with the dissent appears to result from our straightforward application of the principle that the agency is entitled to weigh conflicting evidence. *See*

*Sharma*, 633 F.3d at 871 ("[T]he immigration tribunals were permitted to give [certain] evidence less weight than the other evidence in the record."). The dissent's primary contention is that the country reports "provide[] little information relevant to petitioner's precise claim: that the police have specifically targeted him because of his past political activities and suspected support of militants, *and that they continue to target him and his family*." Dissenting Op. at 24 (emphasis added). By framing the issue this way, the dissent glosses over the fact that the agency justifiably discounted Singh's evidence that Indian police "continue to target him and his family" in light of the country report evidence showing that it is highly unlikely that Singh would be persecuted "because of his past political activities and suspected support of militants" or on account of any other protected ground.

We note again that the BIA did not adopt the IJ's determination that Singh's testimony was not credible. But there is a difference between an adverse credibility determination, on the one hand, and a decision concerning how to weigh conflicting evidence, on the other hand. Our decisions in *Sharma* and *Gu* plainly set out this distinction. *See Sharma*, 633 F.3d at 871; *Gu*, 454 F.3d at 1021 ("The general principle requiring the factfinder and a court of appeals to accept a petitioner's factual contentions as true in the absence of an adverse credibility finding does not prevent us from considering the relative probative value of hearsay and non-hearsay testimony."). We have also recognized this same concept in related contexts. For example, in *Zehatye v. Gonzales*, 453 F.3d 1182 (9th Cir. 2006), we assumed that the petitioner's testimony in support of her asylum application was true because the Board did not make an express adverse credibility determination. *Id.* at 1185 & n.5. Although we

assumed that the petitioner's statements were true, we nevertheless compared her evidence that she would be persecuted in her country of origin with a country report that was generally at odds with her testimony. *Id.* at 1185–87. We denied the petition for review based on the evidence in the country report even though we acknowledged that the report suggested that members of the petitioner's group were persecuted "under some circumstances." *Id.* at 1185. Similarly, in *Aden v. Holder*, 589 F.3d 1040 (9th Cir. 2009), the IJ and the BIA denied the petitioner's asylum application without making an adverse credibility determination. *Id.* at 1043. The petitioner testified that he was persecuted on account of his membership in a particular clan, but the IJ could not confirm that the relevant clans existed "because none of the country materials produced by either side mentioned" the names of the clans described by the petitioner. *Id.* at 1042. The petitioner produced letters that supported the existence of the persecuted clan of which he claimed to be a member, but we explained that such evidence "does not enable us to substitute our judgment about the persuasiveness of this corroboration for the BIA's." *Id.* at 1046. We denied the petition for review. *Id.* at 1047. The bottom line is that we regularly permit immigration tribunals to afford country report evidence more weight than contrary evidence offered by the petitioner even though they have not made an adverse credibility determination because there is a difference between testimony that is not credible and evidence that is not entitled to much weight. *See id.* at 1045 ("Apparently honest people may not always be telling the truth, apparently dishonest people may be telling the absolute truth, and truthful people may be honestly mistaken or relying on unreliable evidence or inference themselves.").

In *Aden*, we offered an example that is particularly useful here: "[I]f, hypothetically, the IJ said 'you seem like an honest person, but the country report says that the [clan of which the petitioner is a member] is treated with great respect and never hindered in any way by the [other] clans,' [the IJ] would weigh persuasiveness in light of the whole record including such evidence." *Aden*, 589 F.3d at 1044–45. That is the situation the IJ confronted in this case. The government introduced country reports containing ample evidence that individuals who were persecuted because of their involvement with Sikh militant groups are no longer likely to be persecuted in India. The petitioner introduced declarations from his wife, father, and village sarpanch stating that Indian police were still searching for him. The IJ then followed our instructions in *Aden* by weighing the "persuasiveness" of the country report evidence "in light of the whole record including such evidence." *Id.* at 1045. Citing our decision in *Gu*, the IJ reasoned that "the declarants have not been questioned to determine the validity and accuracy of the statements, and this is especially problematic in light of the fact that the claims in the affidavits are completely at variance with the country condition evidence. As such the affidavits are entitled to very little weight."

The dissent departs from our case law when it requires the country reports to reveal "country conditions for individuals previously persecuted *and currently wanted by police*" without accounting for the fact that the agency appropriately discounted the evidence showing that Singh is "currently wanted by the police." Dissenting Op. at 24. The dissent proposes what amounts to a two-step framework: first, the petitioner's evidence that he will be persecuted is given full weight; and second, the country report evidence is analyzed through the lens of the petitioner's evidence. This novel

approach disregards the cases where we have permitted the agency to compare country report evidence with the petitioner's evidence that he will be persecuted and to conclude that the petitioner's evidence is not entitled to much weight. *See Gu*, 454 F.3d at 1021; *see also Aden*, 589 F.3d at 1044–46; *Zehatye*, 453 F.3d at 1185–87.

Of course there might be instances where the agency weighs conflicting evidence in a manner that is not supported by substantial evidence. We have considered and rejected that possibility here in light of the comprehensive and precise country reports showing that individuals are unlikely to be persecuted because of their involvement with Sikh separatist groups. The agency properly performed its core functions of weighing conflicting evidence, bringing its expertise to bear, and articulating the rationale underlying its decision. We have no basis to disturb the agency's determination.

IV

The IJ and the BIA determined that the government showed that there has been a fundamental change in circumstances such that Singh's life or freedom would not be threatened on account of his race, religion, nationality, membership in a particular social group, or political opinion if he were removed to India. We conclude that this decision is supported by substantial evidence. Accordingly, the petition for review is **DENIED**.

GETTLEMAN, District Judge, dissenting:

I respectfully dissent from the majority opinion denying petitioner Jagtar Singh's petition for review because, in my view, that denial is based on country reports that do not rebut the presumption of future persecution resulting from this court's ruling in the prior appeal that petitioner suffered past persecution. *Singh v. Keisler*, 249 F.App'x 602 (9th Cir. 2007). The majority confirms the findings by the Immigration Judge ("IJ") and the Board of Immigration Appeals ("BIA") that do not address petitioner's precise claim and that erroneously require petitioner to meet an improper and near-impossible burden of proof, instead of placing the burden on the government, as required by law.[1]

On remand from this court's prior order granting review of the petition for withholding of removal, the government attempted to rebut the presumption of future persecution with a 2008 U.S. State Department Issue paper, a 2007 State Department Country Report (together, the "U.S. Country Reports"), a 2007 United Kingdom Home Office operational guidance note ("the U.K. Report"), and two reports from the United States Citizenship and Immigration Services ("USCIS"). The IJ (as affirmed by the BIA) found that changed country circumstances constituted substantial evidence that petitioner's "mere membership in the Akali Dal Mann Party provides no basis, in today's India, for a finding that he will be persecuted." I respectfully disagree with the majority's approval of this conclusion because this petitioner does not claim persecution "merely" based on his past political activities (for which he was arrested and tortured),

---

[1] 8 C.F.R. §§ 1208.16(b)(1)(ii).

but rather that he has been and continues to be persecuted individually regardless of changed general circumstances.

The IJ erroneously focused on the portions of the tendered country reports that detailed then-current conditions for individuals affiliated with Sikh separatist political movements. These reports provided little information relevant to petitioner's precise claim: that the police have specifically targeted him because of his past political activities and suspected support of militants, and that they continue to target him and his family. To the extent that the reports touched on country conditions for individuals previously persecuted and currently wanted by police, they support petitioner's claim.

The UK Report includes a section on Sikhs that spans a few pages. The Report concludes that Sikhs no longer constitute a persecuted group; but, as noted above, petitioner's claim is not that he will be persecuted simply because he is a Sikh or because of the general political situation. Petitioner's claim is grounded in his previous interactions with Punjabi police (which this court has credited in his first appeal) and his fear of continued persecution (which this court has directed to presumed). The UK Report supports petitioner's claim by noting that the human rights abuses at the time the report was written were different from the abuses of the 1980s because "now the abuse was individual and had specific reasons." Consistent with that observation, petitioner offered evidence that shows that he has been individually targeted by the police, not that he is generally at risk because of his political affiliation.

The U.K. Report further states that it is unlikely that "individuals associated at a low or medium level with Sikh

militant groups would be able to establish a well-founded fear of persecution." The BIA quoted this language from the UK Report as strong evidence that country conditions had changed. That is not, however, the posture of this case; this court has already ruled that this petitioner has established a well-founded fear of individual persecution. *Singh v. Keisler*, 249 F. App'x at 603.

Further, in an unpublished opinion in *Singh v. Holder*, 372 F. App'x 821, 823 (9th Cir. 2010), this court analyzed a UK Country Report similar to the report at issue here.[2] That case held that country reports that do not address a petitioner's specific claim do not support an individualized determination of the petitioner's claim. The petitioner in *Singh v. Holder* claimed that he would be subject to persecution in Punjab as a result of his political opinion and past persecution by police. Of critical significance to the instant case, the court noted that,

> [t]he United Kingdom's India Country Report states that the Sikh militant movement is 'no longer active in the Punjab,' a fact irrelevant to whether persons who were members in the now-dormant movement would face persecution were they to return. In fact, the Report indicates that they would face persecution, stating that persons like Singh,

---

[2] The UK Report submitted in the instant case draws heavily on the Country Report described in *Singh v. Holder*, and in fact uses the same language quoted in the *Singh v. Holder* opinion. Both reports rely heavily on a March/April 2000 fact-finding mission to Punjab by the Danish Immigration Service in drawing their conclusions about the then-current situation of Sikhs in Punjab.

> who have a 'local history of abuse at the
> hands of the police,' or are 'militant[s],' still
> face persecution. There is also no affirmative
> evidence in the State Department's report on
> human rights practices in India to show that
> country conditions relevant to Singh have
> changed. [*Id*.]

*Singh v. Holder* thus succinctly states the flaws in the evidence presented by the government and is wholly inconsistent with the majority opinion in the instant case.[3]

As the majority notes, the 2007 and 2008 U.S. Country Reports barely mention the state of Punjab or Sikhs at all, with the exception of a discussion of the investigation into police misconduct in the mid-1990s. Under *Lopez v. Ashcroft*, 366 F.3d 799, 805 (9th Cir. 2004), "[i]nformation about general changes in the country is insufficient for the government to overcome the presumption." The IJ quotes the 2008 U.S. Country Report, noting that Sikhs have "ascended to the highest levels of the Indian Government," and that the current Prime Minister is a Sikh. This type of general country information is, however, insufficient to rebut a presumption of future persecution, as this court has specifically held in the past. *See Mutuku v. Holder*, 600 F.3d 1210, 1214 (9th Cir. 2010) (finding that a country report that simply asserted that the fact that Kenya's president shared a political affiliation

---

[3] Although the majority criticizes this citation to an unpublished opinion, my reference to *Singh v. Holder* is not as binding precedent, but as a case that is relevant and instructive to the instant case. Circuit Rule 36-3 clearly allows for the citation of unpublished decisions in accordance with Federal Rule of Appellate Procedure 32.1.

with the petitioner did not constitute substantial evidence of changed country conditions).[4]

Although the U.S. Country Reports do mention serious problems in other Indian states, they do not offer any support for the government's argument that the country has changed such that petitioner no longer faces a threat to his life based on his past political affiliation and encounters with police. The omission of any statement about Punjab or Sikhs cannot be construed an affirmative statement that the country has changed for those individuals.  In fact, the IJ criticized the country condition evidence produced by petitioner for its failure to specifically mention human rights abuses in Punjab. The IJ therefore cannot properly find at the same time that the U.S. Reports are sufficient but petitioner's reports are insufficient.

Neither USCIS report mentioned by the majority is discussed in the IJ or BIA opinions.  The first USCIS position paper is titled "India: Information on Treatment of Members of the Akali Dal (Mann) Party in Punjab."  The first question presented is whether Punjab police arrest or otherwise mistreat Sikhs solely on account of membership in the Akali Dal (Mann) party, or for expressing support for the party. Again, this is not petitioner's claim; he does not claim that the police would arrest him randomly because of his political affiliation.  His claim is that they are *already* targeting him based on his past activity and will continue to do so if he returns.  This is entirely separate from the first question addressed in the report.

---

[4] I also note that this is no more informative of country conditions than a claim that racism does not exist in the United States because Barack Obama is president.

The next material question addressed in the first USCIS report is whether Punjabi Sikhs are targeted solely for expressing support for the Khalistani cause. The report concludes that Sikhs are no longer targeted simply for holding pro-Khalistani views. It also notes, however, that "Punjabi Sikhs are likely targeted at times by local officials for holding pro-Khalistani views, but this is not done systematically . . . . any such targeting is probably the work of rogue officers at the local level." This paper thus provides little support for the government's position, and instead demonstrates that the police do in fact target individuals, as petitioner has alleged.

The second USCIS position paper is titled "India: Information Relocation of Sikhs from Punjab to Other Parts of India." This paper addresses whether Punjab police pursue certain Sikhs who have relocated to other parts of India. The paper concludes that "[o]bservers generally agree that Punjab police will try to catch a wanted suspect no matter where he has relocated in India." The position paper also notes that some observers report that police pursue only "high-profile" individuals. Although the paper focuses on militants and members of armed opposition groups, one prominent human rights lawyer stated that "[a] Sikh . . . who [like petitioner] has been arrested one or more times on suspicion of being involved in political militancy, even a person suspected of such an involvement– whether or not the person has ever been actually arrested– is likely to be pursued wherever he or she goes." Thus, the USCIS paper supports petitioner's claim because, as this court found in his prior appeal, he was arrested and tortured on multiple occasions based on his suspected support of militants, and his testimony that police continue to visit his home is consistent with the practices detailed in the USCIS report.

Other than the second USCIS paper, the collective reports offer very little insight into the situation faced by Sikh individuals who, like petitioner, have suffered persecution in the past and continue to be subject to police harassment. This is a substantially different issue than whether "rank and file" members of Akali Dal Mann are persecuted at random. The only report that discusses individuals who have suffered past persecution is the ten-year-old USCIS report regarding the extent to which police pursue individuals who have already been arrested as a result of their affiliation with political and militant groups, and neither the IJ nor the BIA relied on this report. The ambiguous information contained in the reports is not sufficient to establish by a preponderance of the evidence, as 8 C.F.R. § 208.13(b)(1)(i)(A) requires, that conditions have changed to alleviate petitioner's well-founded fear of persecution or to overcome the presumption of future persecution. When "evidence in the country report indicates that persecution similar to that experienced by the petitioner still exists," the presumption of persecution is not rebutted. *Boer-Sedano*, 418 F.3d at 1089. In fact, the information provided in the USCIS papers demonstrates that persecution likely still exists.

Moreover, the IJ erroneously failed to give any weight to petitioner's testimony or the affidavits from his family members because the declarants had not been questioned about the accuracy of their statements. Requiring cross-examination on these types of supporting affidavits is imposing a substantially excessive burden on an applicant. When the burden rests with the government to rebut the presumption of future persecution, it is incongruous that the petitioner should have to not only offer witnesses and evidence, but then secure their availability for cross-examination. The IJ appears to have drawn every inference

against petitioner, instead of appropriately placing the burden with the government.

Finally, the IJ and the majority fault the evidence petitioner presented as unreliable and containing hearsay statements. Petitioner produced sworn affidavits from family members and a local politician regarding their first-hand observations of police conduct and conversations with Indian law enforcement. Because of the IJ's doubts regarding the validity and accuracy of the claims, he accorded petitioner's evidence very little weight. Yet the country and USCIS reports submitted by the government, although official documents, are rife with hearsay-within-hearsay. These papers cite the opinions and speculations of a handful of "India experts," unnamed human rights lawyers, an "expert on religious militancy," and one U.S.-based political scientist. Although the IJ found those statements more "objective" than petitioner's family's sworn statements, they are hardly the kind of detailed and individualized inquiries required to address the record presented in the instant case. *See Singh v. Holder*, 372 F. App'x at 824.

Because I find: (a) that substantial evidence does not support the IJ and BIA's conclusion that the government has adequately demonstrated changed country circumstances; (b) that the IJ and BIA incorrectly shifted the burden of proof to petitioner rather than the government; and (c) that the IJ and BIA failed to conduct the individualized analysis required by law, I would grant the petition for review, direct the BIA to grant petitioner's application for withholding of removal, and remand for consideration of a discretionary grant of asylum.